**REEDY et al., Appellees,**

**v.**

**CINCINNATI BENGALS, INC. et al., Appellants.**

[Cite as *Reedy v. Cincinnati Bengals, Inc.* (2001), 143 Ohio App.3d 516.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–000804 and C–000805.

Decided Feb. 9, 2001.

518

*Milman, Skikos & Polos, Janet G. Abaray* and *Beverly H. Pace,* for appellees.

*Taft, Stettinius & Hollister LLP, Robert G. Stachler* and *Eric K. Combs,* for appellant Cincinnati Bengals, Inc.

*Michael K. Allen,* Hamilton County Prosecuting Attorney, *Carl J. Stich, Jr.,* and *Christian J. Schaefer,* Assistant Prosecuting Attorneys, for appellants Hamilton County and Hamilton County Board of Commissioners.

HILDEBRANDT, Judge.

Defendants-appellants, Cincinnati Bengals, Inc. ("the Bengals"), Hamilton County and the Hamilton County Board of Commissioners ("the county"), appeal from the trial court's order denying a motion to grant a stay of proceedings pending arbitration pursuant to R.C. 2711.02. Since there was not a valid agreement to arbitrate between the plaintiffs-appellees, who were purchasers of personal seat licenses, and the county, we affirm the denial of the requested stay.

A review of the record reveals the following undisputed facts. In an effort to raise money for the construction of Paul Brown Stadium, which would eventually be leased to the Bengals for their home football games, the county, pursuant to

the direction of its commissioners, employed Tri–State Sports and Events, Inc. to create a marketing campaign to entice each season-ticket holder to purchase a personal seat license, which was formally known as a Charter Ownership Agreement ("COA"). By acquiring a COA, the holder would "own [a] piece of the jungle" and thereby be guaranteed seats in a specific area or zone of the stadium for as long as the holder purchased season tickets.

Tri–State, on behalf of the county,[1] distributed a "First Fans" brochure detailing how to acquire a COA. The brochure included a diagram of the stadium seating zones, with corresponding prices, and the "Charter Ownership Rules & Regulations" ("the Rules & Regulations"), which consisted of twenty-three provisions outlining the program. Included in the enumerated provisions were the following rules pertinent to this appeal:

"7. Your application must include a deposit equal to one-third of the total cost of the number of COAs ordered * * *.

"8. Your will receive a COA contract by return mail, but not before March, 1997 at the earliest. This contract must be signed and returned within (30) days. This contract will confirm your assigned zone, but not row and seats(s). If a signed contract is not returned within 30 days, your COA may be forfeited.

"* * *

"15. If you do not make your second or third COA payments, you will forfeit all previous payments and all rights to your COA(s).

"* * *

"22. Your COA contract will outline all terms and conditions of the COA agreement."

There was no arbitration provision in the Rules & Regulations. Plaintiffs-appellees signed the application that accompanied the First Fans brochure, explicitly agreeing to be bound by the Rules & Regulations contained in the brochure, and submitted the required deposit with their respective applications. Prior to making the second installment payment for the purchase of a COA, each plaintiff-appellee received by mail a "contract" entitled Terms of Charter Ownership Agreement ("the COA terms"). The COA terms included the arbitration clause at issue here and an integration clause stating that the agreement, along with the notice letter that assigned seat zones, superseded any prior agreements.

---

1. Under the lease agreement between the county and the Bengals, the Bengals were originally to raise a specific amount of money for the construction of the new stadium. Later, it was determined that the county would sell the COAs until August 2000, using the income generated to fund construction. After August 2000, the Bengals would have the right to sell the COAs and to retain the money.

It was further provided that the second COA fee installment would constitute acceptance of the COA terms. Following that, plaintiffs-appellees submitted their second and third COA payments.

On September 26, 2000, COA purchaser Glenn Reedy, on behalf of himself and others similarly situated,[2] brought an action against the Bengals and the county alleging breach of contract, negligent misrepresentation, and fraud. The complaint also sought a declaratory judgment that the arbitration clause and three other provisions in the COA terms were unenforceable because they had not been bargained for in the purchase agreement. On October 23, 2000, the Bengals filed a motion to stay proceedings pending arbitration. The county joined in the motion on November 3, 2000. The trial court held a hearing on December 11, 2000, and denied the stay, holding that the arbitration clause was not a part of the bargained-for contract between the parties. The Bengals and the county have now each filed an appeal, assigning as the sole assignment of error the trial court's refusal to stay the proceedings pursuant to the valid agreement to arbitrate contained in the COA terms. We have consolidated the two appeals for the issuance of this decision.

R.C. 2711.02 governs a stay of trial proceedings pending arbitration. The statute provides the following in part:

"If any action is brought upon any issue referable to arbitration under *an agreement in writing for arbitration*, the court * * * shall * * * stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement * * *." (Emphasis added.)

When a party requests a stay under the statute, the first issue before the trial court is whether there is a valid written agreement to arbitrate.[3] Both the Bengals and the county maintain in this case that there was a valid written agreement to arbitrate contained in the contract between the parties, but each arrive at that conclusion in a different manner.

■ The Bengals, agreeing with Reedy and the putative class members, assert that the First Fans brochure, which contained the Rules & Regulations, constituted an offer to purchase a COA, and that the first installment payment or "deposit"[4] was the acceptance that formed a contract. According to the Bengals, Reedy and the other COA purchasers consented to the arbitration clause in the COA terms when they accepted the offer, because its terms put them on notice

---

2. We note that a class has been proposed but not yet certified.

3. See *Cross v. Carnes* (1998), 132 Ohio App.3d 157, 167, 724 N.E.2d 828, 835.

4. The Bengals and the county characterize the first installment of the COA fee as a "deposit."

that a contract would be forthcoming, and that "[the] COA contract [would] outline all terms and conditions of the COA agreement." The Bengals also assert that Reedy and the other purchasers reaffirmed their acceptance of the COA terms by submitting their second payments. The county, on the other hand, contends that the COA terms, including the arbitration provision, and not the First Fans brochure, constituted the offer that Reedy and the other purchasers accepted when they submitted their second installment payments. We are unpersuaded by either argument that a valid agreement to arbitrate came into being between the parties.

 The arguments advanced by the Bengals and the county center on when the contract at issue was formed and whether the arbitration clause was included within that contract. In order for a valid contract to exist, there must be a "meeting of the minds" on the essential terms of the agreement, which is usually demonstrated by an offer and acceptance, and consideration.[5] An offer is defined as " 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " [6] Further, the essential terms of the contract, usually contained in the offer, must be definite and certain.[7]

As noted above, the county maintains that an offer and acceptance did not arise from the First Fans brochure and the payment of the deposit for the COA fee, because the First Fans brochure, by referring to unknown terms of a future document, did not contain definite and certain terms that manifested a willingness to enter into a bargain and that invited acceptance. The county cites *Frazier v. Navistar*[8] to support its position that the First Fans brochure was not an offer because a contract cannot come into existence when there remain future terms to be determined. The dissent adopts a similar position by concluding that the First Fans brochure did not constitute an offer to purchase a COA, but was merely a "solicitation for applications for a COA." *Frazier*, however, provides no support for the county's argument nor for the dissent's position. In *Frazier*, the court held that a letter informing employees of a new retirement plan did not constitute an offer because it was clear that Navistar, the employer, did not

5. *Noroski v. Fallet* (1982), 2 Ohio St.3d 77, 79, 2 OBR 632, 633–634, 442 N.E.2d 1302, 1304; 17 Ohio Jurisprudence 3d (1980) 479, Contracts, Sections 17 and 48.

6. *Garrison v. Daytonian Hotel* (1995), 105 Ohio App.3d 322, 325, 663 N.E.2d 1316, 1318, quoting 1 Restatement of the Law 2d, Contracts (1981), Section 24.

7. *Nilavar v. Osborn* (1998), 127 Ohio App.3d 1, 711 N.E.2d 726 citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134, 137.

8. (Apr. 21, 2000), Montgomery App. No. 99–CA–89, unreported, 2000 WL 426162.

intend "to conclude any bargain until [it] received the applications and made further determinations as to which employees would be accepted." [9] In reaching this determination, the court relied on the fact that Navistar, in its letter to the employees, specifically reserved the right to limit the number of employees accepted into the program.[10] In the case at bar, the county, in the First Fans brochure, did not reserve the right to deny a COA to a season-ticket holder who submitted an application and a deposit payment postmarked by January 31, 1997. A season-ticket holder did not submit an application in anticipation that the county would perhaps accept the application and sell the holder a COA, but with the knowledge that the holder would definitely receive a COA. The application merely communicated to the county the season-ticket holder's four choices for zones in which his or her seats would be located. Though the exact zone location purchased by the plaintiffs-appellees was unconfirmed, a provision in the Rules & Regulations indicated that the zones would be assigned on a seniority basis to each purchaser and would follow the choices indicated on the application. Thus, it is reasonable to conclude that assent to this bargain was invited by the Rules & Regulations of the First Fans brochure and that an enforceable agreement thereby came into existence.

■ The county places significance on the facts that some of the terms were not definite, specifically referring to the fact that the stadium was not built when the First Fans brochure was distributed, and that it was not possible at that time to confirm a zone for each COA purchaser. Both of those facts are irrelevant, because assent to a "contract may be conditioned on the happening of some contingency."[11] The First Fans brochure, as well as the COA terms,[12] provided for a full refund of the initial deposit payment if the stadium was not constructed or if a COA purchaser's first, second, third, or fourth zone choice was unavailable.[13]

■■ The Rules & Regulations in the First Fans brochure contained definite and certain terms. In exchange for a set fee, Reedy and other potential class

---

9. *Id.* at 11.

10. *Id.*

11. 17 Ohio Jurisprudence 3d (1980) 445, Contracts, Section 16.

12. Reedy and the other putative class members agree that the COA terms were part of the contract, but only to the extent that they included terms already spelled out in the Rules & Regulations of the First Fans brochure.

13. The Rules & Regulations gave COA purchasers the option of either receiving a refund of their initial payment or having their names placed on a waiting list if none of their zone choices was available.

members received a COA for a specific zone in the stadium, to be determined at a later date based on seniority. It was also clearly stated that, to "accept" this offer, the purchaser had to complete an application and submit one-third of the COA fee by January 31, 1997. The Rules & Regulations also established that the consideration, the COA fee, was to be made in three equal installments, due on specific dates. Reedy and the other purchasers consented to the terms of this offer by signing the application and signifying that "the undersigned had read the rules and regulations provided with the application and agrees to be bound by them." Because there were definite and certain terms that demonstrated a willingness to enter a bargain whereby assent to it would give rise to an enforceable agreement, we hold, as a matter of law, that an offer was contained in the Rules & Regulations and that a meeting of the minds occurred when Reedy and the other purchasers signed the application and submitted their initial payments.[14]

▓ Since there was an enforceable contract under Ohio law, the remaining and critical issue is whether the arbitration provision was included as a term in that contract. Initially, we note that an explicit arbitration provision was not contained in the offer evidenced by the Rules & Regulations. But the county contends that the statement "[a]ll issues regarding the length of ownership of season tickets, and rights to preference in the allocation of seating zones and individual seats will be resolved exclusively by Tri–State Sports and Events, Inc. and determined based on September 1, 1996 account status," found in the First Fans brochure, though not contained in the Rules & Regulations, made the plaintiffs-appellees sufficiently aware of an arbitration provision. As counsel noted, however, "this is nothing more than an acknowledgment by the Bengals and the county that Tri–State Sports will act as their agent in fulfilling their responsibility to determine seniority for awarding account numbers." Further, the statement did not even contain the word "arbitration" and thus did not put

---

**14.** The county maintains that the one-third "deposit" was not consideration for the COA but merely a "pledge to purchase a seat license," because the stadium was not built at the time. We disagree. As we stated earlier, there can be a meeting of minds to form a contract based upon a contingency. The contingency occurred here—the stadium was built—and Reedy and the other COA purchasers were bound to pay the remainder of the fee.

The dissent takes a similar position, concluding that the deposit was merely consideration in exchange for the county to keep the offer open for a specific period, giving the season-ticket holder a chance to review the COA terms. This is inaccurate. The Rules & Regulations specifically referred to the First Fans brochure's diagram of stadium seating and corresponding zone prices. The price of the COA was non-negotiable. The consideration, the fee, was merely split into three equal installments, most likely for the purchaser's convenience, with the Rules & Regulations explicitly stating when each installment was due. The Rules & Regulations provided the terms of the purchase agreement and it is clear that the initial payment was not consideration for an option, but consideration for the purchase of a COA.

**524**

the plaintiffs-appellees on notice that they were bargaining away their right to a trial by jury on claims arising from the COA agreement.

The Bengals and the county, however, argue that there was a meeting of the minds in regard to the arbitration provision when the plaintiffs-appellees assented to the Rules & Regulations, which stated that there would be a COA contract forthcoming and that it must be signed and returned within thirty days, and further stated that the "COA contract [would] outline all terms and conditions of the COA agreement." The county and the Bengals claim that these provisions put the plaintiffs-appellees on notice that future terms, such as the arbitration provision, would govern the COA agreement. We disagree that those provisions provided sufficient notice to plaintiffs-appellees that any claim arising from a COA would be adjudicated through arbitration with no right to a trial by jury. As the plaintiffs-appellees point out, there is nothing in the provisions that indicates that the COA terms would materially alter what the parties had already agreed to. The only open term from the Rules & Regulations was the exact COA zone that each purchaser would be assigned. We hold that it was reasonable for Reedy and the other purchasers to expect that this would be the only materially new provision contained in the COA terms. Further, it would have been relatively simple to include boilerplate language in the Rules & Regulations that all claims arising from a COA would be resolved by arbitration, especially in view of the other conditions outlined in the Rules & Regulations, such as restriction on the transferability of a COA and the forfeiture provision relating to inappropriate behavior at a Bengals game.

The Bengals further contend that, in determining whether the plaintiffs-appellees assented to the future COA terms, including the arbitration clause, by signing the Rules & Regulations, the trial court erroneously placed significance on the fact that the first installment of the COA fee was paid prior to the receipt of the COA terms. In support of this argument, the Bengals cite *Carnival Cruise Lines, Inc. v. Shute*[15] and *Hill v. Gateway 2000*,[16] cases where courts upheld a forum-selection clause and an arbitration provision, respectively, even though payment preceded the consumer's receipt of the contract detailing those terms. Those cases, however, are distinguishable from the case at bar in that the consumer in each instance had the opportunity to revoke the contract and receive a full refund after reviewing the terms of the contract. For example, in *Carnival Cruise Lines*, the United States Supreme Court upheld a forum-selection clause contained in cruise tickets, because the consumers had notice of the clause and

**15.** (1991), 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622.

**16.** (C.A.7, 1997), 105 F.3d 1147.

"presumably retained the option of rejecting the contract with impunity."[17] Similarly, the court in *Gateway 2000* upheld an arbitration provision because the consumer had the opportunity to reject the contract terms by returning the purchased computer within thirty days for a refund. Here, there was no opportunity for plaintiffs-appellees to revoke the COA terms with impunity. If a second installment payment were not made, a COA was revoked, and the plaintiffs-appellees would have to forfeit substantial initial payments pursuant to paragraph 15 of the Rules & Regulations.[18] Thus, *Carnival Cruise Lines* and *Gateway 2000* are not persuasive authority for the proposition that it was irrelevant that the initial payments were made prior to the receipt of the COA terms.

In their final attempt to demonstrate that a meeting of the minds occurred between the parties with respect to the arbitration provision, the Bengals and the county focus on the integration clause in the COA terms, which notified the purchasers that the COA terms would supersede any prior agreements, as well as the provision declaring that payment of the second fee installment would constitute acceptance of the COA terms. As previously noted, the plaintiffs-appellees would have forfeited their initial payments if they did not submit a second installment payment. Further, as we have already determined that the terms contained in the Rules & Regulations governed the existing contract, the plaintiffs-appellees were already obligated to pay for the remainder of the COA fee. If the Bengals and the county had wished to impose different terms on the buyer, new consideration would have been required. This court has previously explained that "neither the promise to do a thing, nor the actual doing of it will constitute a sufficient consideration to support a contract if it is merely a thing which the party is already bound to do, either by law or a subsisting contract with the other party."[19] Here, the plaintiffs-appellees were already bound to pay the second and third fee installments pursuant to the existing contract in exchange for the promise to deliver COAs in specifically requested zones. Since neither party offered new consideration, the COA terms were not

---

**17.** *Carnival Cruise Lines*, 499 U.S. at 595, 111 S.Ct. at 1528, 113 L.Ed.2d at 633.

**18.** The dissent even concedes that a forfeiture provision is harsh, and generally not favored in the law except when bargained for. It was bargained for here, to the extent that the Rules & Regulations stated that COA purchasers would forfeit their payments if they did not make their second and third payments. This is precisely why, according to the plaintiffs-appellees, they made their second and third installment payments. Because the COA purchasers did what they were already bound to do does not mean that they assented to an arbitration provision.

**19.** *Rhoades v. Rhoades* (1974) 40 Ohio App.2d 559, 562, 69 O.O.2d 488, 490, 321 N.E.2d 242, 245, citing 11 Ohio Jurisprudence 2d 320, Contracts, Section 82.

part of the bargained-for contract and, thus, were unenforceable against the plaintiffs-appellees.

Even though the policy in Ohio favors resolving disputes through arbitration, the Ohio Supreme Court has stated that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to so submit * * *."[20] Since a meeting of the minds was absent between the parties regarding the arbitration provision, it was not a term of the existing contract.[21] As we hold that the arbitration provision was not a term of the contract, we do not address the arguments that the arbitration provision was not unconscionable.

Since the arbitration provision was not a term of the contract, no valid agreement to arbitrate existed. Since there must be a valid written agreement to arbitrate before a court may stay proceedings under R.C. 2711.02, we, accordingly, affirm the trial court's order denying a stay of proceedings pending arbitration.

*Judgment affirmed.*

SUNDERMANN, J., concurs.

GORMAN, P.J., dissents.

GORMAN, Presiding Judge, dissenting.

Because the majority's analysis incorrectly focuses on what the plaintiffs thought (or claim they thought) they were being offered, rather than the language of the offer itself, I dissent.

It is entirely understandable why some Bengals fans, caught up in the excitement of the new stadium and eager to own a "piece of the jungle," would have read the First Fans brochure, sent in their deposit, and felt that they had already purchased a COA. The fans' expectations, however, cannot take precedence over the language of the offer itself. When examined literally, the language of the First Fans brochure offered only three things in return for a nonrefundable deposit: (1) an opportunity to pick a desired seat location in a designated zone, (2) priority in seat assignments according to seniority among

---

20. *Council of Smaller Enterprises v. Gates McDonald & Co.* (1998), 80 Ohio St.3d 661, 665, 687 N.E.2d 1352, 1355.

21. See *Nationwide Mut. Ins. Co. v. Marsh* (1984), 15 Ohio St.3d 107, 109, 15 OBR 261, 262–263, 472 N.E.2d 1061, 1062 (an arbitration clause added to an insurance policy after the premium was paid and coverage began was unenforceable, as a matter of law, because there was no meeting of the minds as to its inclusion).

season-ticket holders when seat selection was ultimately made, and (3) an opportunity to accept the zone assignment *according to the terms of the COA*. Completion of the purchase was expressly made conditional upon the fan accepting the terms of the COA contract. Because it is clear to me that the plaintiffs decided to go forward with the purchase of their seats after receiving their zone assignments and the COA, I would hold that the plaintiffs assented to the arbitration clause contained in the COA. Thus, although their substantive claims may well have merit, I believe the plaintiffs should be required to submit them to arbitration as they agreed.

It is well settled that an acceptance cannot materially alter the terms of the offer. I am at a loss to understand how the majority can simply wink at the plain language of the First Fans brochure that they quote. That language states clearly that fans wishing to receive a priority seat assignment needed to "submit an official COA *application*." According to Black's Law Dictionary, an application is "[t]he act of making a request for something." Black's Law Dictionary (5 Ed.1991) 90. In the majority's view, however, this act of requesting something became the making of the contract itself—the handshake, if you will, that sealed the deal.

The brochure also required fans to include a deposit with their application. For the majority, this deposit was consideration for the COA itself. I cannot understand, however, how a deposit accompanying an application ("a request") for an opportunity to review a prospective zone assignment according to the terms of a COA that had yet to be exchanged between the parties could have had the binding effect the majority grants to it.

In my view, the only proper way to treat the deposit is as a nonrefundable application fee to be applied to the purchase price of the COA if the applicant decided to go forward with the purchase after reviewing the zone assignment and the COA. While this view may be harsh, it is exactly what was explained to the fans in the brochure. The brochure told the fans that, in return for their application, they would receive a COA contract and that the "COA contract w[ould] outline all terms and conditions of the COA agreement." The fans were told also that if, after receiving the COA with its terms and conditions, they decided not to go forward with a purchase by making further payment, "you will forfeit all previous payments and all right to your COA(s)."

Concededly, these terms involved a potential forfeiture should the fans have paid their deposit and then discovered either the zone assignment or the terms of the COA were not to their liking. A forfeiture is generally not favored in the law. Indeed, the law is said to abhor a forfeiture. The exception, though, is when the parties freely contract for the potential forfeiture. In my view, the application sent in by the plaintiffs was analogous to the purchase of an option. An option is

a traditional method in which an offer is kept open for a specific period of time if the purchaser pays the offeror a fee. If the purchaser pays the fee, the offeror cannot revoke the option. It is a collateral contract that is strictly construed in favor of the offeror and must be accepted in accordance with its terms. *Brumm v. McDonald & Co. Securities, Inc.* (1992), 78 Ohio App.3d 96, 98, 603 N.E.2d 1141, 1142, fn. 1. See, also, Calamari & Perillo, Contracts (2 Ed.1977), Section 2–27, 88–91.

In an option contract, moreover, the fee is forfeited if the offeree does not exercise the option, as its very purpose is consideration for the privilege of keeping the offer open for a certain stated period of time. This practice is common, for example, in real estate transactions where the earnest money, deposited in escrow, is forfeited if the prospective purchaser backs out of the agreement to purchase.

Accordingly, I would hold that there was no purchase of the COA involved in the application process. The First Fans brochure was, in my view, a solicitation for applications for COAs accompanied by nonrefundable application fees. This being so, I believe it is quite clear that each plaintiff, after receiving a COA and sending in the balance of the money due, expressed assent to the terms of the COA, including the arbitration clause. Significantly, none of the plaintiffs alleged that they intended to reject, or in any way repudiate, the terms and conditions of the COA once they received it along with their zone assignments. It is noteworthy that Reedy filed his complaint on September 15, 2000, three home games into the season, and five days after the first regular-season loss to the Cleveland Browns. It is, indeed, one of the ironies of this case that the arbitration clause has now become the focal point of controversy when there is no evidence that it was even remotely considered a sticking point in the past.

As noted, the fans had been told in the brochure that they must agree to the terms and conditions of the COA in order to complete the transaction. One of those terms was the arbitration clause that the plaintiffs now seek to avoid. That clause clearly stated the following:

"Arbitration. Any dispute or controversy arising out of or in connection with the COAs and these terms or otherwise concerning the relationship between Licensor and Licensee or the Bengals and Licensee, whether arising in contract, tort, or otherwise, shall be submitted to, and decided by arbitration under the rules of the American Arbitration Association. Venue for any arbitration proceeding shall be a reasonable location within Hamilton County, Ohio. The losing party in any such proceeding shall pay the costs thereof, including reasonable attorneys' fees."

Furthermore, the fans were twice admonished that by sending in further payment they were expressing their acceptance of the COA's terms, first in the

general summary that preceded the text and then in Paragraph 12, which stated, "[P]ayment by Licensee of the next installment of the COA Fee due hereunder after deliverance of these terms to Licensee shall constitute, and conclusively be deemed to be acceptance of these terms by Licensee." All the plaintiffs— presumably after having read the COA—sent in their remaining payments.

Since I believe that the COA was the only contract in this case, I do not find relevant the arguments advanced by the plaintiffs, and accepted by the majority, that the COA added terms to an earlier agreement between the parties. As I have noted, the First Fans brochure offered only a limited benefit to an applicant for a COA: an opportunity to review a proposed zone assignment, based upon priority among season-ticket holders, and to decide whether to accept the zone assignment *according to the terms of the COA*. Clearly the COA, which had yet to be exchanged between the parties, was intended to be the actual contract of purchase. To suggest that the COA contained "additional" terms is to presume an earlier contract that existed only in the minds of fans who did not read carefully the terms of the brochure.

For similar reasons, I do not find persuasive the plaintiffs' argument that the arbitration clause was an unconscionable adhesion clause. When parties send in non-refundable money to apply for something to be sold to them under terms they have yet to see, they accept an inherent risk that some of those terms may not be to their liking. The risk, in my view, is calculated. The acceptance of that risk is an act of free will. Whether it was wise for the plaintiffs to have sent their deposit in under such circumstances is not for this court to decide.

The plaintiffs maintain that if the COA was to contain an arbitration clause precluding their judicial remedies, some reference to it should have been in the First Fans brochure. I agree that such a warning would have made their decision to apply for a COA more informed; however, I can find no law that required the county or the Bengals to include such a warning in the brochure. Significantly, the majority, which accepts this argument, cites no law to support it. The plaintiffs also appear to make the argument that the arbitration clause was unconscionable because it did not spell out the costs of arbitration to the consumer. This argument would have merit only if the plaintiffs were required to advance extraordinary costs to arbitrate their small individual claims, or if their ability to hire a lawyer was substantially impaired because expensive hearing fees were required in advance. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 473, 700 N.E.2d 859, 866. Neither of these two factors has been demonstrated in this case.

While the right to a jury trial is a constitutional right of the highest importance, public policy, as the majority has noted, also favors arbitration when the parties agree to it, as I am convinced they did here. *Kelm v. Kelm* (1993), 68

Ohio St.3d 26, 27, 623 N.E.2d 39, 40–41. In this case, arbitration would provide the parties with a much more expeditious means of resolving their individual disputes than the proposed class action that has already disrupted the selling of tickets for the 2001 season. The majority has enjoined the Bengals, during the course of this litigation, from conducting the team's normal business with owners of 2001 seat licenses. The effect of their holding today is to prolong this disruption as the parties gear up for a protracted litigation that will only further intrude upon the business affairs of the Bengals and the National Football League.

In sum, I believe that the majority and the trial court have improperly exalted the unjustified expectations of the plaintiffs over the language of the offer contained in the First Fans brochure. Throughout its decision, the majority hastens to point out that the plaintiffs' expectations were not unreasonable. I agree that their expectations were not unreasonable—no one is accusing the plaintiffs of dealing in absurdities. The question, though, is not whether the plaintiffs' expectations were reasonable, but whether they were legally justified. The answer to that question lies not in what was in the plaintiffs' minds, but in what was said in the brochure.

I would hold, therefore, that the First Fans brochure offered merely an opportunity to review the COA and a zone assignment, in exchange for a nonrefundable application fee that would be applied to the purchase price should an applicant decide to accept the terms of the COA, including the arbitration clause. Since all the plaintiffs agreed to those terms when they tendered full payment after receiving their COAs, I would reverse the judgment of the trial court and grant the stay, pending arbitration pursuant to R.C. 2711.02.