Jay **DUNKELMAN** et al., Appellants,

v.

The **CINCINNATI BENGALS, INC.**, Appellee.

[Cite as *Dunkelman v. Cincinnati Bengals, Inc.*, 158 Ohio App.3d 604, 2004-Ohio-6425.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040427.

Decided Dec. 3, 2004.

Lopez, Hodes, Restaino, Milman & Skikos, Janet G. Abaray, Beverly H. Pace, and Calvin S. Tregre Jr., for appellants.

Taft, Stettinius & Hollister, Eric Combs, and Katherine Ruwe, for appellee.

MARK P. PAINTER, Judge.

{¶ 1} We address another chapter in the seemingly endless fallout from the construction of Paul Brown Stadium and its aftermath.

{¶ 2} This case presents a simple legal question about arbitration clauses. It is not about how a professional sports franchise should treat its fans. The trial court ruled that an arbitration clause was enforceable and punted the case to binding arbitration. The fans appealed that call; after review, we reverse the call made on the field and send the case back to the trial court.

## I. Fans Become Former Fans

{¶ 3} Plaintiffs-appellants are Jay Dunkelman, Edward Walton, and Robert and Betty Brown (for convenience, we designate them as "the fans," though "the former fans" might be more accurate). They appeal from a decision granting

defendant-appellee Cincinnati Bengals' motion for a stay pending arbitration and staying their motion for a preliminary injunction.

{¶ 4} Dunkelman, Walton, and the Browns are the named plaintiffs in a putative class action against the Bengals. Evidently disenchanted by the Bengals' decade of demise, these fans stopped buying season tickets. The Bengals tried to make them pay for the tickets anyway. The fans sued the Bengals, alleging common-law claims of negligent misrepresentation and fraud, along with statutory violations of the Ohio Consumer Sales Practices Act[1]—all as a result of the fans' dealings with the Bengals regarding season tickets for club (luxury) seats.

{¶ 5} We do not reach the merits of the complaint here despite addressing the document upon which the complaint was based. This opinion addresses only whether the trial court erred in finding the controversy to be arbitrable.

{¶ 6} The fans assign two errors, asserting that the trial court (1) should not have granted the Bengals' motion to punt the case to arbitration and (2) should have granted their motion for a preliminary injunction. We hold that the trial court erred as a matter of law in finding the controversy to be arbitrable and in refusing to rule on the preliminary injunction.

## II. A Convoluted Way to Get to a Ballgame

{¶ 7} During the construction of Paul Brown Stadium, the Bengals and Hamilton County decided to sell season-ticket "seat licenses" in the new stadium as a source of revenue to help pay for the construction. Fans were told that they could not buy tickets directly; they first had to buy a license to buy a seat. Then they had to actually buy the seats. This two-step handoff engendered misunderstanding and court cases.

{¶ 8} The county hired a company called Tri–State Sports to help with season-ticket sales. Together, they began the "First Fans Program." Part of the program included sending brochures to fans to market club and general-admission seat licenses for Paul Brown Stadium. The fans could return a form from the brochure if they wanted to purchase a seat license. Probably "seat license" did not sound important enough, so they called it a "Charter Ownership Agreement" ("COA").

{¶ 9} By purchasing a COA (seat license), a fan bought the right to purchase season tickets at a discounted rate for a specified number of years. Anyone who wanted to buy season tickets to the Bengals games had to first buy a COA. The

---

1. R.C. 1345.01 et seq.

seats involved here, club seats, generally provided a better view of the field than general-admission seats.

{¶ 10} The brochure also stated that after the purchase of the COA for $150 for each seat, "the Bengals will send you a Club Seat License Agreement which will specify your seat zone and lease term."

{¶ 11} The brochure for club seat licenses included a section marked "Charter Ownership Rules & Regulations" and a color-coded diagram of the future stadium. According to those regulations, if patrons failed to pay for season tickets during their leases, they lost the $150–per–seat fee that they had paid to obtain a COA and also forfeited their right to obtain future season tickets for those seats.

{¶ 12} The rules also established that "Club Seats require a deposit of 25% of the initial annual lease price upon execution of the License Agreement." This security deposit was refundable at the conclusion of the lease term. The brochure then set out a payment schedule for upcoming seasons and explained the terms of the six-, eight-, or ten-year licenses. A key provision stated, "Once you have purchased your COA(s) and the new stadium opens, you must continue to purchase season tickets for your assigned seats on an annual basis to maintain your rights. Failure to purchase season tickets will forfeit your right to your COA."

{¶ 13} After the fans selected their seat zone and sent in their payment, the Bengals sent them another document, a "Club Seat License Agreement" ("CSLA"), which added some provisions not part of the original COA. The Bengals say these provisions are binding; the fans say the original COA, not the CSLA, controls. The fans claim that the Bengals tried to change the rules in midgame.

{¶ 14} The Bengals sent them an invoice that allowed the patrons to select the section of seats they desired, as well as to elect which lease term they wanted. The invoice said, "The Cincinnati Bengals thank you for ordering Club Seats in the new Paul Brown Stadium." The invoice also referred to the CSLA. That document, which the Bengals did not require patrons to sign and return, included a general arbitration clause. It also contained a default and acceleration provision that required patrons to pay for any unbought season tickets over the duration of their lease, even if the patrons did not want to buy the tickets. The default and acceleration clauses are the underlying issues here. The fans claim that the clauses were slipped into the deal—a sort of hidden-ball trick, or at least an illegal pass.

{¶ 15} But everything that could be considered the terms of a contract was in the COA brochure. The price of the tickets was specified—and the contract even

included a guarantee that prices would not be raised above a certain amount during the contract term. The brochure provided space for patrons to sign their names, thus binding them to the Ownership Rules and Regulations.

{¶ 16} The Bengals now argue that the first brochure, the COA, was merely a brochure—not a contract. And they now argue that they did not create the brochure. They point out that Hamilton County and Tri–State Sports—not the Bengals—sent out the brochure. But this is a distinction without a difference. The Bengals were the ultimate beneficiaries of any agreement that eventually led to the purchase of season tickets—and they agreed to the game plan. The team logo appeared throughout the brochure, and the Bengals' address was on the outside of it. The county and the Bengals were, in this scheme at least, on the same team. In legal terms, the county was at least an agent of the Bengals. In real terms, they were in cahoots.

{¶ 17} The plaintiffs here are a class of fans who signed COAs, but stopped buying season tickets. The Bengals tried to get them to pay for the season tickets that they had refused to buy. Then the fans sued the Bengals to enjoin them from collecting the money and from harassing them about payments.

### III. Standard of Review

{¶ 18} The Bengals contend that the standard when reviewing a trial court's stay order pending arbitration is abuse of discretion. This is generally accurate when reviewing most arbitration cases.[2] But the cases the Bengals have cited and the cases that those cases relied on to support this proposition dealt with arbitration clauses that were challenged by allegations of waiver and fraud in the factum.[3] Both of those claims involve questions of fact, not law. The appropriate standard of review there would indeed be abuse of discretion.

{¶ 19} But the challenge here is whether the arbitration clause was part of the contract between the parties. This is a matter of contract interpretation—a question of law, not fact. At least as far as necessary for our decision on this issue, there are no facts in dispute. (The Bengals and the fans disagree about whether the fans knew about the arbitration clause when they received the invoice, but this does not affect the outcome.)

---

**2.** See *Harlamert v. Fischer Attached Homes, Ltd.,* 1st Dist. Nos. C–020462 and C–020463, 2003-Ohio-674, 2003 WL 328025.

**3.** See, e.g., *I Sports v. IMG Worldwide,* 157 Ohio App.3d 593, 2004-Ohio-3631, 813 N.E.2d 4, ¶ 10; *Coble v. Toyota of Bedford,* 8th Dist. No. 83089, 2004-Ohio-238, 2004 WL 99039; *Harsco Corp. v. Crane Carrier Co.* (1997), 122 Ohio App.3d 406, 701 N.E.2d 1040.

{¶ 20} Whether a controversy is arbitrable under a contract is a question of law for the trial court to decide.[4] On that issue, appellate courts will generally accept the trial court's findings of fact but review the questions of law de novo.[5] Therefore we decide the legal issue here—we are the referees.

## IV. An Appropriate Class?

{¶ 21} Before we examine the assignments of error, we must determine whether the fans are bound by a settlement agreement from an earlier case.

{¶ 22} As in any class action, a plaintiff can only bind other class fans who are similarly situated with a common nucleus of facts and law, and where the plaintiff is representative of the other class members.[6]

{¶ 23} The conflict in this case is familiar. We decided *Reedy v. Cincinnati Bengals* nearly four years ago.[7] That case involved nearly identical claims regarding the purchase of general-admission (not club) season tickets for Bengals games. That suit alleged breach of contract, negligent misrepresentation, and fraud.[8]

{¶ 24} After we held that arbitration was improper in *Reedy*, the parties settled the case. Their settlement agreement included an arbitration clause covering any future disputes. So if the fans here are bound by the *Reedy* settlement, the Bengals win this game. But the fans are not, and the Bengals do not.

{¶ 25} The fans correctly argue that *Reedy* concerned only general-admission seat licenses. The COA in the *Reedy* case was conspicuously titled "Charter Ownership Agreement, *General Admission,* Terms Summary." (Emphasis added.)

{¶ 26} The Bengals now argue that Dunkelman and Walton were part of the *Reedy* class and are therefore bound to arbitrate any disputes. But all four named fans are proper parties in this case because the *Reedy* settlement is inapplicable here. *Reedy* and the subsequent settlement dealt only with general-

---

4. *Vanyo v. Clear Channel Worldwide* (2004), 156 Ohio App.3d 706, 2004-Ohio-1793, 808 N.E.2d 482, ¶ 8.

5. Id., fn. 2; see, also, *Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 145, 593 N.E.2d 286.

6. See Civ.R. 23(A).

7. *Reedy v. Cincinnati Bengals* (2001), 143 Ohio App.3d 516, 758 N.E.2d 678.

8. Id. at 520, 758 N.E.2d 678.

admission COAs. This case involves club seats and an entirely different agreement.

{¶ 27} The Bengals now claim that the fans never raised the distinction between the *Reedy* class of general-admission ticketholders and this class of club-seat COA purchasers and that this argument has thus been waived on appeal. But the Bengals' claim fails because the language in the fans' appellate brief can also be found in the trial transcript.

{¶ 28} Neither the CSLA nor the *Reedy* settlement binds the parties to arbitration here. The only way the fans could be bound to arbitration is if they agreed to it during their purchase of the COA and club seats.

### V.  *Arbitrability and Reedy*

{¶ 29} In their first assignment, the fans argue that the trial court should not have granted the Bengals' motion to stay the proceedings. We agree.

{¶ 30} "An arbitration agreement will be enforced unless the court is firmly convinced that (1) the clause is inapplicable to the dispute or issue in question or (2) the parties did not agree to the clause."[9]

{¶ 31} In *Reedy*, we affirmed the trial court's decision to deny the Bengals' motion to grant a stay of proceedings pending arbitration. The trial court ruled, and we agreed, that there was not a valid arbitration agreement between the parties. We reached this holding despite the fact that Ohio public policy favors resolving disputes through arbitration.[10] " '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit * * *.' "[11] The *Reedy* fans did not agree to submit to arbitration. Neither did the current fans.

{¶ 32} We held in *Reedy* that arbitration was not proper because an arbitration provision was not a term of the contract. The same question is before this court. And *Reedy* is the controlling precedent.

{¶ 33} Under *Reedy*, we held as a matter of law that the initial rules and regulations formed the complete contract—not the later document that the Bengals claimed was the contract.[12] "Because there were definite and certain

9. *Estate of Brewer v. Dowell & Jones*, 8th Dist. No. 80563, 2002-Ohio-3440, 2002 WL 1454069.

10. See *Brennan v. Brennan* (1955), 164 Ohio St. 29, 57 O.O. 71, 128 N.E.2d 89.

11. *Council of Smaller Enterprises v. Gates McDonald & Co.* (1999), 80 Ohio St.3d 661, 665, 687 N.E.2d 1352, quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.* (1960), 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409.

12. *Reedy v. Cincinnati Bengals* (2001), 143 Ohio App.3d 516, 523, 758 N.E.2d 678.

terms that demonstrated a willingness to enter a bargain whereby assent to it would give rise to an enforceable agreement, we hold, as a matter of law, that an offer was contained in the Rules & Regulations and that a meeting of the minds occurred when Reedy and the other purchasers signed the application and submitted their initial payments."[13]

{¶ 34} We also held that it was reasonable for purchasers to expect that the only materially new provision would be the exact seat zone to which they would be assigned. The same holds true here.

{¶ 35} The parties here did not agree to the arbitration clause. Just as in *Reedy*, a contract was formed when the fans sent in the initial payment.

{¶ 36} The Bengals now argue that these fans' payments of the invoices demonstrated their assent to the terms in the CSLA. But this is the very same argument the Bengals made (and this court flatly rejected) in *Reedy*. "If the Bengals and the county had wished to impose new terms on the buyer, new consideration would have been required."[14] The Bengals argue that the payment of the invoice was that consideration. But under the terms of the COA as described in the brochure, had the fans not purchased the season tickets, they would have been in default on the COA and would have lost it and the $150 per seat paid towards the COA. Though the payment schedule was slightly different in *Reedy* (payments were made in installments), the result is the same. Again, the Bengals tried to change the rules during the game.

{¶ 37} For the subsequent arbitration term to have become enforceable by the payment of the accompanying invoice, the patron would have had to retain the contractual option to revoke the terms with impunity without having to forfeit the substantial initial payments.[15] In the present case, the fans were not given the opportunity to reject the terms of the CSLA without breaching the COA contract, thus losing their substantial initial payments. The fans' payments towards the season tickets could not serve as the consideration necessary for incorporating the additional terms as outlined in the CSLA. What was true in *Reedy* is true here—the Bengals could not use the COA to bind fans to pay for the license, then slip in additional terms when the fans paid for their tickets.

{¶ 38} Once the fans sent in their payments for the COA, the Bengals were committed to offering club seats to holders of the right to purchase. The brochure stated that the right to purchase tickets would be forfeited if the

---

13. Id.

14. Id. at 525, 758 N.E.2d 678.

15. Id.

purchaser chose not to purchase season tickets. All that was left was to determine the seat zone of the tickets. But the Bengals tried to slip additional terms into the contract after the fans had already agreed to it. The fans acted reasonably in believing that the only material information that would be forthcoming was the specific seat zone.

{¶ 39} Therefore, as a matter of law, the contract was formed when the fans signed the application for a COA and submitted their initial payments. The fans never agreed to submit to arbitration. Therefore, the arbitration clause was invalid; the trial court should not have stayed the proceedings for arbitration. We therefore sustain the fans' first assignment of error and return the trial court's punt.

## VI. Preliminary Injunction

{¶ 40} In their second assignment, the fans contend that the trial court should have ruled on their motion for a preliminary injunction prior to issuing its stay pending arbitration. Because we have already sustained the first assignment, we need only quickly note that the fans are correct here. But we decline to rule on the motion itself.

{¶ 41} The Bengals made numerous attempts to collect the fee for unused season tickets from potential class members. At least one Bengals fan said that he was intimidated into purchasing season tickets that he did not even use. The fans requested that the trial court grant a preliminary injunction to prevent such tactics. But the trial court stayed that decision, along with all other proceedings, pending arbitration.

{¶ 42} During the pendency of this appeal, the Bengals sent a letter to another fan indicating that they had prevailed in the trial court and that the fan now had to pay what they asked. The letter stated, "[A] few Club Seat holders brought suit asking a judge to allow them to simply cancel their Club Seats. A Hamilton County Court ruled two weeks ago in favor of the Cincinnati Bengals and allowed the team to proceed to arbitration to collect the amounts due as provided in the Club Seat License Agreement."

{¶ 43} This was disingenuous at best: the trial court decided only to send the case to arbitration—not that the Bengals were owed money. It was actions such as these that required us to grant an emergency injunction prohibiting contact between the Bengals and the fans during this appeal.

{¶ 44} When a trial court is faced with a motion to stay pending arbitration and a motion for a preliminary injunction, the motion for a prelimi-

nary injunction should be heard first.[16]

**{¶ 45}** The trial court's decision to stay a ruling on the fans' motion for a preliminary injunction pending arbitration was erroneous. The purpose of a preliminary injunction is to preserve the status quo of the parties pending a decision on the merits. It is for this very reason that we granted the fans' emergency motion for a preliminary injunction during this appeal.

**{¶ 46}** Because of our holding in response to the first assignment of error, the stay pending arbitration is now lifted, and we need not determine the merits of the motion for a preliminary injunction itself. Rather, the trial court must examine that question on remand.

**{¶ 47}** We reverse the trial court's decision and remand this case to the trial court with instructions to (1) lift the stay pending arbitration and proceed with the case and (2) rule on the preliminary injunction.

Judgment reversed
and cause remanded.

DOAN, P.J., and HILDEBRANDT, J., concur.

---

16. See *Yudin v. Knight Industries Corp.* (1996), 109 Ohio App.3d 437, 439, 672 N.E.2d 265.