[Cite as *Kinnett v. Corporate Document Solutions, Inc.*, 2019-Ohio-2025.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

MEGAN KINNETT,                          :          APPEAL NO. C-180189
                                                  TRIAL NO. A-1703277
    Plaintiff-Appellant,             :

 vs.                                    :          *O P I N I O N.*

CORPORATE DOCUMENT                      :
SOLUTIONS, INC.,
                                        :
HAROLD PERCY, JR.,
                                        :
    and
                                        :
MARY PERCY,
                                        :
    Defendants-Appellees,
                                        :
    and
                                        :
ARENA MANAGEMENT HOLDINGS,
LLC, d.b.a. US BANK ARENA,               :

    Defendant.                       :


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 24, 2019


*Robert A. Winter, Jr.,* and *The Deters Law Firm P.S.C.* and *Fred Johnson*, for
Plaintiff-Appellant,

*Dinsmore & Shohl LLP, Michael W. Hawkins* and *Elizabeth Stegeman,* for
Defendants-Appellees.

**ZAYAS, Judge.**

{¶1}   The violence endured by plaintiff-appellant Megan Kinnett is tragic. As a 15-year-old child, she was sexually assaulted by defendant-appellee Harold Percy, Jr., while working for him. Kinnett now appeals from the trial court's March 16, 2018 entry granting a motion to enforce the settlement agreement made by defendants-appellees Corporate Document Solutions, Inc., and its owners, Harold Percy, Jr., and his wife, Mary Percy (collectively "CDS").   Enforcement of the settlement agreement limits the amount of all civil damages caused by CDS to $65,000.   As an appellate tribunal, we are bound to follow the law and accept the findings of fact made by the trial court if there was sufficient evidence to support those findings. After careful review of the record, we cannot overturn the credibility determination made by the trial court which is dispositive of the case and results in an enforceable settlement agreement.

## I.   Percy Assaults Kinnett

{¶2}   Kinnett was employed by CDS.  Kinnett's mother had been employed by CDS for over 18 years.  Kinnett had known Harold Percy her entire life and viewed him as a father figure.   In her complaint, Kinnett alleged that on a Saturday in October or November 2013, 52-year-old Harold Percy had approached 15-year-old Kinnett after work and talked to her about school and her family life.  During their talk at the CDS workplace, he provided alcoholic beverages for her to drink.  When Kinnett's mother arrived to pick her up, Percy obtained her permission to take Kinnett to a Cincinnati Cyclones hockey game at US Bank Arena along with his two sons and another girl.  Kinnett's mother agreed.  Kinnett, however, was the only person who accompanied Percy to the game.

{¶3}   Before and during the game, Percy continued to purchase alcoholic beverages for Kinnett.  He encouraged her to finish each drink.  Finally, Percy told Kinnett that they should leave the game early to avoid traffic.  He took the visibly

intoxicated Kinnett to his vehicle in the arena's parking garage. There Percy violently sexually assaulted Kinnett. She sustained bruises over her breasts, torso, and genital area. She suffered permanent injuries to her pelvic floor as a result of Percy's sexual attack, and she may not be able to have sexual intercourse in the future without accompanying pain.

{¶4} Out of fear for retribution against herself and her mother, Kinnett returned to work at CDS. In February 2014, Percy sexually assaulted Kinnett again, this time at an apartment that he maintained on the CDS premises.

{¶5} Kinnett also alleged that Mary Percy knew of Harold's actions, and that he was using their business to prey on and to harass other female employees at CDS. Mary Percy used her position as part-owner and company administrator to intimidate Kinnett, her mother, and other female employees from coming forward with claims against Harold Percy and the company.

{¶6} On June 19, 2017, Kinnett filed suit against CDS and the Percys asserting claims alleging battery, sexual harassment, intentional infliction of emotional distress, fraud, civil conspiracy, and vicarious liability. She also asserted claims against US Bank Arena. She sought damages for her past and future medical bills, pain and suffering, lost income and benefits, and compensatory damages, attorney fees, and punitive damages.

## II. Settlement Negotiations

{¶7} On September 26, 2017, the trial court granted CDS's motion to stay these proceedings until the resolution of Harold Percy's criminal prosecution. Thereafter, the parties entered into settlement negotiations. Kinnett settled her claims against US Bank Arena and continued negotiating with CDS and the Percys. The negotiations were conducted by CDS's trial counsel Mike Hawkins, his associate Elizabeth Stegeman, and Kinnett's counsel Frederick Johnson. Johnson held himself out to CDS as having authority to settle the claims on behalf of his client.

3

{¶8} On December 21, 2017, after conducting initial discussions with Hawkins, Johnson sent Hawkins a written offer to settle Kinnett's claims for $75,000. CDS rejected the offer and indicated that it would be more likely to settle the matter "in the $20,000s, maybe." For the next two days, the parties had several communications by telephone and email. Hawkins stated that CDS would be willing to pay "somewhere around" $50,000.

{¶9} On December 23, 2017, Kinnett offered to settle the matter for $65,000. Johnson left a voicemail for CDS's counsel: "Hi Mike. It's Fred. I talked to [Kinnett] and she advised me to * * * give an offer back to you of $65,000. So give me a call, let me know." Hawkins replied the next day, "I received your message at $65,000. If we are able to get this done, we need to be closer to the $50,000 I said I hoped to get. Can we get it done at that number?" Johnson replied that "it was going to take $65,000," and that "65 is the number." Discussions continued between Hawkins and Johnson throughout December and early January.

{¶10} The parties' descriptions of their discussions before early January 2018 largely agree. But at the subsequent March 2, 2108 hearing on CDS's motion to enforce a settlement agreement, the parties' recounting of the events of January 8, 2018 diverge. Hawkins and Stegeman testified that the parties had reached an agreement as to all essential terms on January 8, 2018. Johnson and his paralegal Melissa Johnson testified that Kinnett had had a change of heart and had withdrawn the offer to settle the claims for $65,000.

{¶11} Hawkins testified that, on January 8, 2018, he and Stegeman called Johnson, and that Johnson had confirmed that Kinnett would settle the case for $65,000. Hawkins testified that he had "asked [Johnson] look, we're going to go back to [CDS]. We just want to confirm it's going to take 65 to settle it." Both Hawkins and Stegeman testified that Johnson replied, "[Y]es, it would take 65,000 to settle it."

4

Hawkins also testified that Johnson had never conveyed to him at any point that he lacked authority to settle the matter on behalf of his client, Kinnett.

{¶12} Hawkins testified that the next day, he had left a voicemail message on Johnson's answering machine "confirming we have a settlement at $65,000." He also sent an email stating, "I left you a message that we are settled at $65,000. Are you ok with advising the Court to avoid the status conference tomorrow?" Johnson replied to Hawkins that he would need to verify the settlement with Kinnett, as "she may have changed her mind." Hawkins stated that he had reminded Johnson that Johnson had confirmed the $65,000 settlement offer on January 8, 2018. Johnson replied, "[T]hat was then, this [is] now."

{¶13} In his direct testimony, Johnson agreed that he had authority to settle the matter when he made the December 23, 2017 offer. But he recounted how Kinnett had become upset by the settlement negotiations and had told him around January 5, 2018, that she no longer wished to settle her claims. Upon questioning by the trial court, Johnson admitted that he had not informed Hawkins and CDS that Kinnett had revoked his authority to settle until January 8. Nonetheless, on cross-examination, Johnson was asked, "On January 8, when you had a conversation with Hawkins, did you call Kinnett and say, I just spoke with Mike Hawkins and 65 is the number?" Johnson replied, "Yes."

### III. The Trial Court Grants the Motion to Enforce Settlement

{¶14} On March 16, 2018, the trial court journalized its decision granting CDS's motion to enforce the settlement agreement. The court found that

> A valid settlement demand for $65,000 by [Kinnett] was made upon [CDS] on December 23, 2017. * * * There were no special conditions on the demand.

* * *

5

[CDS] never rejected the $65,000 demand but continued to try and negotiate. These negotiations were neither a rejection of the $65,000 nor a counter offer. *[Kinnett] claims the demand was withdrawn and/or made subject to new approval by the plaintiff in a January 8, 2018 phone call. This is not credible. I find the testimony of [Hawkins] and [Stegeman] to be credible.* In any event, the purported withdrawal of the demand was not communicated to [CDS] before the demand was accepted. I find the demand remained open and was accepted by [CDS] on January 9, 2018. The Motion to Enforce is granted.

(Emphasis added.)

{¶15} The trial court ordered CDS to deposit $65,000 with Hawkins to satisfy Kinnett's release of all her claims against CDS and the Percys. It also ordered CDS to pay court costs and each side to pay its own attorney fees.

{¶16} Kinnett brought this appeal from that entry.

## IV. The Settlement Agreement Was Enforceable

{¶17} In her sole assignment of error, Kinnett claims that the trial court erred in finding an enforceable settlement agreement. She acknowledges that her trial counsel made an offer to settle her claims against CDS for $65,000 on December 23, 2017. But she argues that CDS's subsequent counteroffers extinguished that offer, that she had revoked her trial counsel's authority to settle the matter, and that the parties' failure to agree to all essential elements of the proposed settlement, including the confidentiality of the settlement, meant that there was no agreement for the trial court to enforce.

{¶18} A settlement agreement is a contract designed to terminate a claim by preventing or ending litigation. It is an agreement between a plaintiff and a

6

defendant that the plaintiff will compromise her claim for relief and release a defendant from liability upon the defendant's payment of an amount of money. The law highly favors settlement agreements as an efficient means to prevent or to end litigation. *See Infinite Sec. Solutions, L.L.C. v. Karam Properties, II, Ltd.*, 143 Ohio St.3d 346, 2015-Ohio-1101, 37 N.E.3d 1211, ¶ 16; *see also Weckel v. Cole + Russell Architects*, 2013-Ohio-2718, 994 N.E.2d 885, ¶ 20 (1st Dist.).

{¶19} The standard of review to be applied to a ruling enforcing a settlement agreement depends primarily on the nature of the question presented. If the dispute under review is a question of law, such as whether the parties have entered into an enforceable agreement, an appellate court must review the decision de novo to determine whether the trial court's decision to enforce the settlement agreement was based upon an erroneous standard or a misconstruction of the law. If, however, the question is a factual one, such as whether an offer and acceptance has been made, a reviewing court will not overturn the trial court's finding if there was sufficient evidence in the record to support the finding. *See Cembex Care Sols., LLC v. Gockerman*, 1st Dist. Hamilton No. C-050623, 2006-Ohio-3173, ¶ 8; *see also Rayco Mfg. Inc. v. Murphy, Rogers, Sloss & Gambel*, 2018-Ohio-4782, 117 N.E.3d 153, ¶ 29 (8th Dist.); *Garrison v. Daytonian Hotel*, 105 Ohio App.3d 322, 325, 663 N.E.2d 1316 (2d Dist.1995) (holding that the question whether an offer and acceptance has been made is a question of fact to be determined from all the relevant facts and circumstances). Here, the credibility of the witnesses was for the trial court, sitting as the trier of fact, to determine in the first instance. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *see also Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶20} Kinnett first challenges the trial court's finding that CDS had not rejected her December 23, 2017 offer to settle for $65,000, but had simply "continued to try and negotiate." Kinnett claims that Hawkins's December 24, 2017 statement

7

that the parties needed to be "closer to $50,000" was a counteroffer that extinguished CDS's ability to subsequently accept Kinnett's offer to settle for $65,000.

{¶21} Ultimately, this is an issue of conflicting testimony, and the determination of witnesses' credibility and the resolution of conflicts in the evidence are matters for the trier of facts. *Cross v. Ledford*, 161 Ohio St. 469, 477-478, 120 N.E.2d 118 (1954). " 'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.' " *In re Estate of Knowlton*, 1st Dist. Hamilton No. C-050728, 2006-Ohio-4905, ¶ 35, quoting *Seasons Coal* at 81. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal* at 80.

{¶22} Here, the trial court expressly found Johnson's testimony regarding the events of January 8, 2018 "not credible," and the testimony of Hawkins and Stegeman "credible." Based on that factual determination of witness credibility, the trial court concluded that on January 8, 2018, Johnson had confirmed that $65,000 would settle the case, and that CDS had indicated its assent to those terms no later than January 9, 2018. There was no other evidence on this issue outside of the testimony. We must defer to the trial court's credibility determination and conclusion.

{¶23} Kinnett next argues that because she had revoked Johnson's authority to settle her claims by January 5, 2018, and that that fact had been conveyed to CDS by Johnson in the January 8, 2018 phone call, the trial court erred in enforcing the settlement agreement. Kinnett maintains that since Johnson lacked authority to settle her claims, the settlement was unenforceable.

8

**{¶24}** If a client authorizes her attorney to negotiate a settlement and the attorney *negotiates a settle*ment within the scope of that authority, the client is bound by the settlement. *See Bromley v. Seme*, 2013-Ohio-4751, 3 N.E.3d 1254, ¶ 25 (11th Dist.). If an attorney exceeds his settlement authority, that misconduct must be imputed to the client and the client's remedy lies elsewhere. *See Lepole v. Long John Silver's*, 11th Dist. Portage No. 2003-P-0020, 2003-Ohio-7198, ¶ 16; *see also Argo Plastic Prods. Co. v. Cleveland*, 15 Ohio St.3d 389, 392-393, 474 N.E.2d 328 (1984).

**{¶25}** Here, Hawkins had testified that at no point before January 9, 2018, had Johnson ever informed CDS that he lacked authority to settle the matter on behalf of Kinnett. Hawkins's and Stegeman's recollections of Johnson's statement that the case could be settled for $65,000 on January 8, 2018, were consistent with that conclusion. Moreover, Johnson's actions and his own testimony were consistent with the conclusion that he had authority to settle the case on January 8, 2018. Johnson's testimony that he learned of Kinnett's withdrawal of his authority on January 5, 2018, however, was inconsistent with his other testimony that the offer remained on the table three days later.

**{¶26}** Because it didn't find Johnson credible on this issue, the trial court concluded that Kinnett had not informed CDS of any revocation of Johnson's authority to settle the matter until after CDS accepted the renewed January 8, 2018 offer. Again, we must defer to the trial court's determination on credibility.

**{¶27}** Finally, Kinnett argues that there was no settlement agreement for the trial court to enforce, because the parties had not yet agreed upon all the essential terms of the agreement. This issue presents a legal issue, and thus this court reviews de novo the question whether the trial court's decision to enforce the settlement agreement was based upon an erroneous standard or a misconstruction of the law. *See Cembex*, 1st Dist. Hamilton No. C-050623, 2006-Ohio-3173, at ¶ 8.

{¶28} Like all contracts, a settlement agreement requires an offer, acceptance, consideration, and mutual assent to essential terms to bind the parties. *See Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16-17; *see also Reedy v. Cincinnati Bengals, Inc.*, 143 Ohio App.3d 516, 521, 758 N.E.2d 678 (1st Dist.2001). A meeting of the minds as to the essential terms of a contract is a requirement to enforcing the contract. *See Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991); *Union Sav. Bank v. White Family Cos., Inc.*, 183 Ohio App.3d 174, 2009-Ohio-2075, 916 N.E.2d 816, ¶ 15 (2d Dist.). If a contract encompasses the essential terms of the agreement, it is binding and enforceable. *See Mr. Mark Corp. v. Rush, Inc.*, 11 Ohio App.3d 167, 169, 464 N.E.2d 586 (8th Dist.1983).

{¶29} The essential terms of a settlement agreement are the price of the settlement to be paid by the defendant and plaintiff's release of the defendant from liability. *See Breech v. Liberty Mut. Fire Ins. Co.*, 2017-Ohio-9211, 101 N.E.3d 1199, ¶ 41 (5th Dist.); *see also Cembex* at ¶ 10; *Hopes v. Barry*, 11th Dist. Ashtabula No. 2010-A-0042, 2011-Ohio-6688, ¶ 32.

{¶30} Here, the essential terms of the settlement agreement were established by Johnson's testimony that Kinnett's January 8, 2018 offer was to settle all her claims for $65,000. Kinnett did not present any testimony in the trial court that other terms had also been essential to the agreement. Kinnett notes that the parties did not agree to the matters of how CDS's payment was to be made and whether a confidentiality agreement would apply to the settlement agreement. Yet these terms are secondary to the meeting of the parties' minds on the essential terms of the agreement. These "less essential terms" may be resolved by "later agreement," or as here, by "judicial resolution." *See Mr. Mark Corp.* at 169; *see also Hopes* at ¶ 32.

{¶31} The trial court provided in its entry that the full $65,000 payment was to be transferred to Kinnett as a condition of enforcing the agreement. Kinnett's

concern that no confidentiality term is contained in the agreement is misplaced. Kinnett wished to retain the ability to publically discuss Percy's horrific actions. Thus, any term that would have limited her ability to speak freely about Percy or CDS would potentially have been essential to CDS and not to Kinnett.

{¶32} The trial court's decision to enforce the settlement agreement on the basis that there had been a meeting of the minds as to the essential terms of the settlement agreement—the price of settlement to be paid by CDS and Kinnett's release of CDS from liability—was based upon the correct legal standard and was not a misconstruction of the law. *See Cembex* at ¶ 8; *see also Breech* at ¶ 41.

{¶33} Kinnett's sole assignment of error is overruled. Therefore, the judgment of the trial court is affirmed.

Judgment affirmed.


**MOCK, P.J.,** and **MYERS, J.,** concur.


Please note:

The court has recorded its own entry on the date of the release of this opinion.

11