DECISION.
{¶ 1} This case is one of several involving one estate. The resolution of this case will resolve very little. We affirm the trial court's judgment, but vacate certain of the magistrate's factual findings.
 I. The Parties {¶ 2} Austin E. "Dutch" Knowlton was a successful businessman and part owner of the Cincinnati Bengals. Upon his death in 2003, his estate was worth millions of dollars due to his nearly 30% share of the Cincinnati Bengals.
 {¶ 3} Movants-appellants P. Valerie Knowlton and Peter Knowlton are two of Dutch's three children. Because Peter has died, his estate is a party to this suit. (To avoid confusion, we refer to these parties as the Knowlton children). They moved to remove the co-executors, attorney Charles Lindberg and Fifth Third Bank, for their failure to recover valuable estate assets. The assets at issue involve two transactions in the waning years of Knowlton's life: (1) the transfer of Knowlton's Emerald Farms to Augustana College, Lindberg's alma mater, in December 1999; and (2) the transfer of 60 shares of Bengals stock in December 2002 for $100,000 per share, considerably under market value.
 {¶ 4} The probate court denied the Knowlton children's motion.
 II. Conflict of Interest? {¶ 5} Knowlton was known as a shrewd and successful businessman. He owned and operated a very profitable construction company that built many of the dormitories at Ohio's colleges and universities. His sizable fortune also enabled him to own shares of stock in both the Cincinnati Reds and the Cincinnati Bengals. But upon his death, the only business venture that remained was his roughly 30% share of the Cincinnati Bengals.
 {¶ 6} Knowlton died on June 25, 2003, at the age of 93. Five days later, his February 17, 1996, will was admitted to the Hamilton County probate court. The probated will did not acknowledge or make any provisions for his children or grandchildren. Under the will, Robert Fite and Charles Lindberg were to be nominated as co-executors. If a co-executor died, Fifth Third Bank was to be the successor co-executor. Because Fite died in 2000, Fifth Third Bank was appointed as the successor co-executor.
 {¶ 7} Under the terms of the will, most assets are to be distributed to the Austin E. Knowlton Foundation either directly or through the Second Restatement of the Agreement of Trust of Austin E. Knowlton. The current trustees of the foundation are Lindberg and his two sons, John Lindberg and Eric Lindberg. Both John Lindberg and Eric Lindberg are successor trustees, with John Lindberg having been installed as a trustee by his father and brother within a week of Knowlton's death. And the current trustees of the trust are Charles Lindberg and Robert Fite's successor trustee, the Fifth Third Bank.
 {¶ 8} The largest asset in Knowlton's estate is his 176 shares of Cincinnati Bengals stock. Although the value of this stock is difficult to determine, experts have placed the value between $42 and $356 million.
 {¶ 9} Although the full administration of the estate and a will contest continue in other proceedings, in this case the Knowlton children challenge Lindberg's role as co-executor. In particular, they argue that Lindberg violated his fiduciary duty to the estate and the disciplinary rules covering conflicts of interest. These allegations have arisen because Lindberg and his firm, Taft, Stettinius, and Hollister ("Taft"), represented Knowlton in matters specifically relating to the Brown family and the Cincinnati Bengals while simultaneously representing the interests of the Brown family and the Bengals. The Knowlton children also suggest that Lindberg and his family have gained control of the Knowlton Foundation and, in doing so, now control all of Knowlton's Bengals stock and other assets.
 {¶ 10} The Knowlton children also challenge Fifth Third Bank's role as co-executor. They assert that Fifth Third Bank is taking directions from Lindberg and has failed to perform its duty in an unbiased manner. In particular, the Knowlton children argue that Fifth Third Bank has failed to undertake any independent review of the matters disputed in this estate.
 {¶ 11} Lindberg and Fifth Third Bank maintain that they have not violated any fiduciary duty and that Taft obtained informed consent from Knowlton and the Cincinnati Bengals to represent them simultaneously more than 30 years ago. Also, Lindberg has testified that Taft observed a "Chinese Wall,"[1] an ethical screening concept where lawyers assigned to Knowlton and the Bengals, respectively, did not share confidences or secrets regarding Knowlton or the Bengals with lawyers working for the other client.
 {¶ 12} The Knowlton children rebut Lindberg by pointing out that there is no documentary evidence that Knowlton either was fully informed of or waived the conflict of interest arising from Taft's simultaneous representation of the Brown family, the Bengals, and Knowlton. There exists not one scrap of paper to support the consent.
 {¶ 13} At the heart of the allegations of conflicts of interest are two business transactions in the last years of Knowlton's life.
 III. A Questionable Transfer of Bengals Stock {¶ 14} According to the Knowlton children, two events occurred before their father's death that caused them to question Lindberg and Fifth Third Bank's ability to administer the estate neutrally. The first event was the sale of 60 shares of Knowlton's Bengals stock (approximately 10%) to the Brown family for only $100,000 per share. The Knowlton children contend that Lindberg sold these shares while Knowlton was seriously disabled, both physically and mentally. They argue that, through this transfer of stock, Knowlton lost his super-minority position in the Bengals, as well as $28 to $120 million in valuable assets. With the Brown family gaining control of the 60 shares of stock for only $6 million, they gained the ability to create new regulations to limit Knowlton's voting power.
 {¶ 15} Lindberg argues that Knowlton alone negotiated with Mike Brown an extension to a 1983 Subchapter S agreement to continue income distributions for five additional years. The original Subchapter S agreement in 1983 was negotiated by Lindberg and guaranteed that the Bengals would, for ten years, distribute 100% of their income to shareholders. These distributions provided Knowlton with $27 million from 1984 to 1994.
 {¶ 16} In exchange for the five-year extension, Knowlton agreed to grant an option to the Brown Family Trust, exercisable on Knowlton's death, to buy 60 shares of Bengals stock for $100,000 per share. This five-year extension brought Knowlton an additional $22.3 million in distributions. And in 1998, Lindberg negotiated a second extension of the distribution agreement through 2000.
 {¶ 17} But in 2001, the Bengals refused to grant any further extensions of the agreements and reduced shareholder distributions to only the amount necessary for the shareholders to pay taxes. Lindberg claims that this decision led to Knowlton's cash-flow shortfall. After reviewing Knowlton's financial situation in the fall of 2002, Lindberg discussed with Knowlton whether he should approach Mike Brown about exercising the option agreement while Knowlton was alive. Lindberg insists that Knowlton directed him to proceed, and the sale of 60 shares of Bengals stock was finalized in December 2002.
 {¶ 18} The Knowlton children argue that Knowlton did not understand the consequences of the stock transfer and that his financial situation did not demand such drastic steps. The Knowlton children's expert, Edward VonderBrink, testified that Knowlton had cash or cash equivalents over $7 million, more than enough to cover his indebtedness. They therefore believe that this transfer of stock might be voidable and that the assets could be returned to the estate. Additionally, because the Brown Family Trust controlled the 60 shares upon Knowlton's death, it did not elect to exercise the option within the one-year option period. The Knowlton children assert that because the Brown Family Trust did not exercise the option within one year following Knowlton's death, it expired. Also, they contend that if the 60 shares were returned to the estate, then the estate would not be hindered by the below-market transfer.
 IV. Was it a Gift to The Ohio State University or to Augustana College? {¶ 19} The second event the Knowlton children question is the transfer of Knowlton's valuable home in Delaware County, Ohio, also known as Emerald Farms, to Lindberg's alma mater, Augustana College, through a power of attorney prepared by the Taft firm. The Knowlton children maintain that Knowlton's wishes were for Emerald Farms to be transferred to The Ohio State University. They also contend that, shortly after Knowlton's death, Lindberg and his sons granted Augustana the right to sell Emerald Farms despite the fact that, under the terms of the transfer, Emerald Farms was not to be sold for a minimum of ten years following Knowlton's death. The Knowlton children thus contend that the money obtained through the sale could be retrieved and returned to the state.
 {¶ 20} The Knowlton children believe that Lindberg's alumnus status with Augustana College led to its acquisition of Emerald Farms. The Knowlton children point to the Special Power of Attorney signed by Knowlton, providing Lindberg with the power to transfer Emerald Farms by gift. Knowlton granted Lindberg the power to give Emerald Farms to Ohio State with a condition that the house be used as the president's residence, or "to any other institution of higher education." The Knowlton children insist this was an example of a questionable transaction where Lindberg used his friendship with Knowlton as a means to benefit his alma mater.
 {¶ 21} Lindberg admits that Knowlton wanted to give Emerald Farms to Ohio State. But Lindberg claims that the gift was conditioned on Ohio State using Emerald Farms as its president's residence. When Ohio State refused that condition, Lindberg claims, Knowlton instructed him to donate the home to Augustana College to facilitate a year-end tax deduction. Knowlton retained a life-estate interest while Augustana College received a remainder in fee simple in Emerald Farms. After Knowlton's death, Augustana concluded that the home would not adequately serve as a retreat center or have any other educational purpose. Augustana petitioned the Knowlton Foundation trustees for approval to sell the property. And the trustees approved the sale of Emerald Farms as long as the proceeds would adequately honor Knowlton's name.
 V. Expert Testimony on Conflicts of Interest {¶ 22} The magistrate heard expert testimony from all parties. Geoffrey Stern, an attorney expert for Lindberg, said that the potential conflict arising from the Taft firm's multiple representation of Knowlton and the Cincinnati Bengals was waivable. Additionally, Michael Cooney, another expert for Lindberg, testified that there was nothing unusual about the special power of attorney prepared to consummate the transfer of Emerald Farms.
 {¶ 23} The Knowlton children presented experts who found conflicts of interest. Joseph Wittenberg, an attorney expert for the Knowlton children, testified that Lindberg could be neither neutral nor unbiased, and was not qualified to serve as an executor. Wittenberg stated that Lindberg was not a suitable fiduciary because of (1) Lindberg's failure to examine why the option for the 60 shares of Cincinnati Bengals stock was exercised before death; (2) Lindberg's unwillingness to waive the attorney-client privilege; and (3) Lindberg's potential financial interests in the fiduciary fees he could earn as executor and trustee.
 {¶ 24} Former Ohio Supreme Court Justice Craig Wright also testified as an expert for the Knowlton children. He maintained that Lindberg's continued representation of Knowlton while Taft represented the Bengals was a violation of DR 5-101 and DR 5-105. Justice Wright also stated that he had no confidence that Fifth Third could be effective as a co-executor because the bank took directions from Lindberg.
 VI. The Magistrate's Decision {¶ 25} In denying the Knowlton children's motion to remove the co-executors, the magistrate stated that there was no substantive basis to remove Lindberg from his fiduciary position as executor. The magistrate found that while it was undisputed that Taft simultaneously represented both Knowlton and the Cincinnati Bengals, the evidence demonstrated that Lindberg had no personal knowledge of any secrets or confidences of the Cincinnati Bengals. Additionally, the magistrate stated that Taft had erected a "Chinese Wall" to prevent the flow of information — that attorneys working on Knowlton matters were not privy to Bengals information and vice versa; that the files were maintained in separate locations and were kept under lock and key; and that full disclosure of the multiple representations was made to each client.
 {¶ 26} In regard to the acceleration of the option agreement to transfer 60 shares from Knowlton to the Brown Family Trust, the magistrate found that the transfer was proper considering Knowlton's "dire financial situation." The magistrate reasoned that the asset most easily liquidated was the 60 shares of Bengals stock, as long as the Brown family was agreeable to the acceleration of the option. The magistrate further noted that for the co-executors to attempt to set aside the transfer would have been "nonsensical," as "there * * * [was] no question that the Browns were going to exercise the option upon Mr. Knowlton's death. Whether the option was exercised during life or after death has little significance to this court."
 {¶ 27} The magistrate also stated that the gift of Emerald Farms was proper. The magistrate noted that "it was evident that it had always been Mr. Knowlton's intent to leave the property to a college or university. While the initial donee had been identified as [The] Ohio State University, his subsequent designation of Augustana College as recipient of the gift causes no alarm to the court." The magistrate further found no evidence of "any sinister machinations by Mr. Lindberg which included Mr. Knowlton to transfer Emerald Farms to Augustana College."
 VII. Motion to Remove Executor {¶ 28} In their first assignment of error, the Knowlton children maintain that the trial court erred in denying their motion to remove the co-executors, Lindberg and Fifth Third Bank. The Knowlton children argue that they presented sufficient evidence to demonstrate that Lindberg could not act as a neutral fiduciary.
 {¶ 29} A decision denying a motion to remove an executor is a final appealable order.[2] And the statutory basis for removing a fiduciary or executor is found in both R.C. 2109.24
and 2113.18. Under R.C. 2109.24, "the court may remove any such fiduciary * * * for habitual drunkenness, neglect of duty, incompetency, or fraudulent conduct, because the interest of the trust demands it, or for any other cause authorized by law."
 {¶ 30} And R.C. 2113.18(A) states, "[t]he probate court may remove any executor or administrator if there are unsettled claims existing between him and the estate, which the court thinks may be the subject of controversy or litigation between him and the estate or persons interested therein."
 {¶ 31} The language of R.C. 2109.24 and 2113.18(A) demonstrates that the decision to remove an executor is within the sound discretion of the probate court, and a reviewing court will not reverse the trial court's order unless it appears that the lower court abused its discretion.[3] An abuse of discretion connotes an arbitrary, unreasonable, or unconscionable decision by the trial court.[4] Unreasonable means that no sound reasoning process supports the decision.[5]
 {¶ 32} Here, the Knowlton children hinged their removal motion on the language of R.C. 2109.24 — "any other cause authorized by law." The Knowlton children maintained that Lindberg and Fifth Third Bank needed to be removed because neither could act as an unbiased fiduciary.
 {¶ 33} In the present case, the magistrate denied the Knowlton children's motion for removal of the co-executors, Lindberg and Fifth Third Bank. In doing so, the magistrate acknowledged that while Taft simultaneously represented both Knowlton and the Cincinnati Bengals, no evidence was presented from which the court could conclude that Taft had failed to adequately represent the interests of each of these clients. The magistrate further found that there was no evidence to demonstrate that Taft had disclosed any confidences of either client to the other.
 {¶ 34} The magistrate examined whether Taft had an effective screening process among the attorneys working for Knowlton and those working for the Cincinnati Bengals. The Ohio Supreme Court, in Kala v. Aluminum Smelting Refining Co., listed factors to be considered in deciding whether an effective screen has been created. The factors include (1) whether the law firm is sufficiently large and whether the structural divisions of the firm are sufficiently separate to minimize contact between the quarantined attorney and the others; (2) the likelihood of contact between the quarantined attorney and the specific attorneys responsible for the current representation; (3) the existence of safeguards or procedures that prevent the quarantined attorney from having access to relevant files or other information relevant to the present litigation; (4) prohibited access to files and other information on the case, locked case files with keys distributed to a select few, and secret codes necessary to obtain access to relevant information on electronic hardware; (5) instructions given to all members of a new firm regarding the ban on exchange of information; and (6) the prohibition of the sharing of fees derived from such litigation.[6] As detailed earlier in this decision, the magistrate found that Taft had met the requirements of Kala in erecting its "Chinese Wall" between attorneys working on the Knowlton and Bengals matters. (The fact that a firm such as Taft, representing opposing parties in multimillion-dollar transactions, would obtain consent from both parties and erect a Chinese Wall, all without generating a single piece of paper evidencing a waiver, evidently did not pique the magistrate's interest.)
 {¶ 35} While we may have found otherwise, the probate court did not find a conflict of interest between Lindberg and the estate. A judge or magistrate, acting as the trier of fact, is in the best position to observe the witnesses, weigh the evidence, and evaluate the testimony. Therefore, "[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not."[7]
 {¶ 36} Here, we cannot say that the probate court's decision was arbitrary, unreasonable, or unconscionable. We are therefore constrained to hold that the court did not abuse its discretion in denying the Knowlton children's motion for removal.
 {¶ 37} Thus, the Knowlton children's first assignment of error is overruled.
 VIII. The Trial Court Properly Reviewed the Magistrate's Decision {¶ 38} In their second assignment of error, the Knowlton children offer another reason why the probate court erred by denying their motion to remove the executors. The Knowlton children insist that, in doing so, the probate court did not review the magistrate's recommendations de novo.
 {¶ 39} The magistrate entered a decision in April 2005, and the Knowlton children timely filed their objections to the magistrate's findings under Civ.R. 53(E)(3). After hearing the objections to the magistrate's decision, the probate court denied the Knowlton children's motion to remove the co-executors on the grounds that "the arguments raised by the Movants for removal of the Co-Executors will be properly considered and adjudicated through other proceedings, including either through the Movant's Objections to the Amended Inventory or the Will contest action(s)."
 {¶ 40} The Knowlton children argue that because the probate court did not "adopt" the magistrate's decision, and instead only denied their motion, it did not properly rule on the merits of the magistrate's findings. The Knowlton children claim that because the probate court did not (1) adopt or reject the magistrate's decision, (2) recommit the matter to the magistrate with further instructions, or (3) hear additional evidence, the court had only one remaining option — to conduct a de novo review and issue a decision on the merits. They further maintain that we should remand this case for such a review.
 {¶ 41} Lindberg and Fifth Third Bank rebut the Knowlton children's arguments by noting that the probate court used the nomenclature "deny" regarding the Knowlton children's motion, and "sustain" regarding the magistrate's decision. Lindberg and Fifth Third Bank insist that no magic words are required to adopt a magistrate's decision, and that the probate court fully complied with Civ.R. 53.
 {¶ 42} Civ.R. 53 provides the protocol to be followed by the trial court when objections to a magistrate's decision are filed. The rule states that "the court shall rule on any objections. The court may adopt, reject or modify the magistrate's decision, hear additional evidence, recommit the matter to the magistrate with instructions or hear the matter. The court may refuse to consider additional evidence proffered upon objections unless the objecting party demonstrates that with reasonable diligence the party could not have produced that evidence for the magistrate's consideration."
 {¶ 43} The standard of review for a trial court's decision to adopt, or not to adopt, a magistrate's decision, is whether the trial court abused its discretion.[8] And as discussed earlier in this decision, an abuse of discretion connotes an arbitrary, unreasonable, or unconscionable decision by the trial court.[9] Unreasonable means that no sound reasoning process supports the decision.[10]
 {¶ 44} In the present case, the probate court issued an opinion and entry sustaining the magistrate's decision and denying the Knowlton children's motion to remove the co-executors. In doing so, the court analyzed the three transactions that the Knowlton children had called into question throughout the proceedings: (1) the transfer of Emerald Farms to Augustana College and the Knowlton Foundation's authorization to Augustana to sell the property; (2) the transfer of 60 shares of Bengals stock for $100,000 per share; and (3) the sale by a third party of one share of Bengals stock for $325,000, on which the estate could base its valuation of its Bengals shares.
 {¶ 45} The court noted that the Knowlton children had objected to all three of these transactions in a motion entitled "Objections to Amended Inventory" in the proceedings for the full administration of the estate. In the court's view, because each of these transactions were the subject of litigation in other proceedings, the Knowlton children would have ample opportunity to subpoena witnesses, conduct discovery, and investigate and argue about the three transactions at issue. The court concluded that the "Objections to Amended Inventory" was the "appropriate avenue to consider the propriety of th[e] transactions." We are not convinced that this was unreasonable.
 {¶ 46} The probate court issued a written opinion "sustaining" the magistrate's decision. Although the probate court did not specifically address each of the Knowlton children's objections, the court's opinion addressed the subject matter of all the objections — the three transactions the Knowlton children found questionable. And because a court "need not address specific objections" where the court's disposition of those objections can be inferred from the court's opinion,[11] we hold that the probate court made a full and independent judgment on the referred matter.[12]
 {¶ 47} The Knowlton children's belief that the probate court did not rule on the objections because the court did not use the word "adopt" is based on mere semantics. The court held a hearing, afforded the parties the opportunity to introduce new evidence, and provided independent reasoning and analysis. The effect of the probate court's ruling was not to adopt or reject the magistrate's decision — it was to modify it. In doing so, the probate court met the requirements of Civ.R. 53(E)(4)(b).
 {¶ 48} But the Knowlton children's claim did have some merit. The probate court's decision, while not unreasonable, created a procedural anomaly. By concluding as a matter of law that the "appropriate avenue to consider the propriety of [the three] transactions is through the Objections to Amended Inventory," the probate court essentially made the magistrate's findings of facts a nullity. Thus the probate court saw no need to formally adopt the magistrate's factual findings
 {¶ 49} In simpler terms, the probate court modified the magistrate's decision under Civ.R. 53(E)(4)(b) by ruling that another proceeding was more appropriate to litigate the questionable transactions. By modifying the magistrate's decision, and neither using nor adopting the findings of fact, the probate court made a reasonable decision about where these transactions should have been litigated.
 {¶ 50} Because neither party should be bound by findings of facts that were neither adopted nor used by the probate court to come to its determination — and because the probate court held that the issues involved in the transactions questioned here were properly to be decided in different proceedings — we conclude that the findings of fact relating to those transactions are a nullity. But because the probate court's modification of the magistrate's decision was otherwise proper under Civ.R. 53(E)(4)(b), the Knowlton children's second assignment of error is overruled.
 {¶ 51} Accordingly, we affirm the probate court's judgment with the proviso that it not be construed to adopt the magistrate's findings of fact.
Judgment affirmed as modified.
Hildebrandt, P.J., concurs.
(Judge Rupert A. Doan was a member of the panel, but diedbefore the release of this decision.)
[1] See Kala v. Aluminum Smelting Refining Co.,81 Ohio St.3d 1, 10, 1998-Ohio-439, 688 N.E.2d 258.
[2] See In re Estate of Meloni (Dec. 23, 2004), 11th Dist. No. 2003-T-0096.
[3] See In re Estate of Jarvis (1980), 67 Ohio App.2d 94, 97,425 N.E.2d 939.
[4] See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
[5] See AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161,553 N.E.2d 597; State v. Echols (1998), 128 Ohio App.3d 677, 669-670,716 N.E.2d 728.
[6] Kala, 81 Ohio St.3d at 10-11, 1998-Ohio-439,688 N.E.2d 258.
[7] See Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 81, 461 N.E.2d 1273.
[8] See Solomon v. Solomon, 157 Ohio App.3d 807,2004-Ohio-2486, 813 N.E.2d 918, at ¶ 16.
[9] See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
[10] See AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161,553 N.E.2d 597; State v. Echols (1998), 128 Ohio App.3d 677, 669-670,716 N.E.2d 728.
[11] See Inman v. Inman (1995), 101 Ohio App.3d 115, 118,655 N.E.2d 199.
[12] See DeSantis v. Soller (1990), 70 Ohio App.3d 226, 232,590 N.E.2d 886.