[Cite as *Ditech Fin., L.L.C. v. Balimunkwe*, 2025-Ohio-4884.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| DITECH FINANCIAL, LLC, | : | APPEAL NO. | C-240060 |
| | | TRIAL NO. | A-1700815 |
| Plaintiff-Appellee/Cross-Appellant, | : | | |
| | : | | |
| vs. | | *JUDGMENT ENTRY* | |
| | : | | |
| KALEMBA BALIMUNKWE, | | | |
| | : | | |
| Defendant-Appellant/Cross-Appellee, | : | | |
| | | | |
| and | : | | |
| | | | |
| CITY OF CINCINNATI, et al., | : | | |
| | | | |
| Defendants. | : | | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**
**Enter upon the journal of the court on 10/24/2025 per order of the court.**

**By:**_____
       **Administrative Judge**

[Cite as *Ditech Fin., L.L.C. v. Balimunkwe*, 2025-Ohio-4884.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| DITECH FINANCIAL, LLC,[1] | : | APPEAL NO.  C-240060<br>TRIAL NO.   A-1700815 |
|     Plaintiff-Appellee/Cross-<br>    Appellant, | : | |
| | : | |
|  vs. | : | *O P I N I O N* |
| KALEMBA BALIMUNKWE, | : | |
| | : | |
|     Defendant-Appellant/Cross-<br>    Appellee, | : | |
|     and | : | |
| CITY OF CINCINNATI, et al., | : | |
|     Defendants. | : | |


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 24, 2025


*McCarthy, Lebit, Crystal & Liffman, Charles A. Nemer, John E. Moran, Dinsmore & Shohl LLP, Nathan H. Blaske* and *W. Scott Leaman*, for Plaintiff-Appellee/Cross-Appellant,

*Arnold Law Firm, LLC, George M. Parker* and *James S. Arnold* for Defendant-Appellant/Cross-Appellee.

---

[1] On September 22, 2022, the trial court granted a motion to substitute NewRez, LLC, d.b.a. Shellpoint Mortgage Servicing, for Ditech Financial, LLC, as party plaintiff. However, because the caption on the trial court's judgment and Balimunkwe's notice of appeal both continue to list Ditech Financial, LLC, as plaintiff, the appeal in this court was docketed under that caption.

CROUSE, **Presiding Judge.**

**{¶1}** Plaintiff-appellee NewRez, LLC, d.b.a. Shellpoint Mortgage Servicing ("Shellpoint") alleged that defendant-appellant Kalemba Balimunkwe defaulted on a debt secured by a mortgage and sought to foreclose on that mortgage. The case went to trial before a magistrate. Balimunkwe claimed the signatures on the promissory note and mortgage were not his and sought to have a forensic document examiner testify to that effect. He also maintained that Shellpoint lacked standing to seek foreclosure. The magistrate excluded Balimunkwe's expert under Evid.R. 702, found that Shellpoint had standing, and entered a decision in Shellpoint's favor. The trial court adopted the magistrate's decision and issued a judgment and decree in foreclosure. Balimunkwe timely appealed. For the reasons set forth below, we affirm the judgment of the trial court.

## I. BACKGROUND

### A. The Documents

**{¶2}** The case, at its heart, is about documents. The four most relevant of these documents are as follows.

**{¶3}** *First* is an April 2, 1999 mortgage on a property at 931 Chateau Avenue, Cincinnati, Ohio ("the 1999 mortgage"), which secured an obligation to repay a $47,000 loan from First Franklin Financial Corporation ("First Franklin"). This document lists Kalemba Balimunkwe and his then-wife (now ex-wife) as borrowers and mortgagors and bears both of their signatures.

**{¶4}** *Second* is a promissory note dated February 10, 2004 ("the 2004 note"), which obligated "Kalemba B Balimunkwe" to repay a sum of $63,750, plus interest at an adjustable rate starting at 7.125 percent per annum, to First Franklin, a "subsidiary of National City Bank of Indiana" ("NCBI"). Payments were to begin on April 4, 2004,

and the loan was to mature on March 1, 2034. The copy of the note admitted at trial bore a signature that read "Kalemba B Balimunkwe." Balimunkwe's ex-wife's name does not appear on this document.

{¶5} *Third* is another mortgage on 931 Chateau Avenue, dated February 10, 2004 ("the 2004 mortgage"), which states that it secures the 2004 note. The copy of the 2004 mortgage and riders admitted at trial contains several signatures of "Kalemba Balimunkwe" or "Kalemba B Balimunkwe." It also bears the signature and seal of an Ohio notary public. Balimunkwe's ex-wife's signature does not appear on this document.

{¶6} *Fourth* is a February 14, 2006 document purporting to modify the terms of the 2004 note ("the 2006 modification agreement"). Under the modification agreement, Balimunkwe agreed to pay the note holder—listed as National City Home Loan Services, Inc. ("NCHLS")—$62,495.23, plus interest at a fixed rate of 7.875 percent per annum, beginning April 1, 2006. The copy of the 2006 modification agreement admitted at trial contains the signature of "Kalemba Balimunkwe" above a handwritten social security number and the seal of an Ohio notary public. A separate signature page contains only the signature of a "Sandy Owens," listed as "Operations Manager" of NCHLS.

### B. Federal & Pretrial Litigation

{¶7} In 2014, Balimunkwe filed a fraud suit against Bank of America, First Franklin's successor in interest, and Residential Credit Solutions ("RCS") in the Hamilton County Court of Common Pleas. The suit was removed to federal court, where it was rejected by a magistrate judge, the district court, and the Court of Appeals for the Sixth Circuit. *See Balimunkwe v. Bank of Am., N.A.*, 2016 U.S. Dist. LEXIS 981, *1 (S.D. Ohio Jan. 6, 2016) ("*Balimunkwe I*") (magistrate judge's report and

4

recommendation), *adopted* 2016 U.S. Dist. LEXIS 24781 (S.D. Ohio Feb. 29, 2016) ("*Balimunkwe II*"), *aff'd* 2017 U.S. App. LEXIS 19875 (6th Cir. Jan. 17, 2017) ("*Balimunkwe III*").

**{¶8}** A month after the Sixth Circuit's ruling, Ditech Financial, LLC ("Ditech"), filed a complaint against Balimunkwe in the Hamilton County Court of Common Pleas, alleging that Balimunkwe had defaulted on the 2004 note and asserting a right to have the 2004 mortgage foreclosed. Specifically, Ditech's complaint alleged Balimunkwe owed $53,066.13 under the note, with interest to be calculated from April 1, 2012, at a rate of 7.875 percent per annum.

**{¶9}** Balimunkwe answered Ditech's complaint, asserting that his signatures on the 2004 note and mortgage were both forged, and that the 2004 mortgage had been "negligently and fraudulently notarized."

**{¶10}** The case was referred to a magistrate, who granted summary judgment for Ditech. The trial court adopted the magistrate's summary-judgment decision, but this court reversed in *Ditech Fin., L.L.C. v. Balimunkwe*, 2019-Ohio-3806 (1st Dist.) ("*Balimunkwe IV*"). In our opinion, we noted that Balimunkwe had filed an affidavit, report, and curriculum vitae of a handwriting expert who had opined "'that Kalemba Balimunkwe did not sign his signatures on the questioned documents.'" *Id.* at ¶ 3. This, we held, "created a genuine issue of material fact as to whether Balimunkwe entered into the 2004 loan refinance agreement." *Id.* at ¶ 10. After also rejecting Ditech's ratification argument, we reversed the trial court's summary judgment and remanded the cause for further proceedings. *Id.* at ¶ 13-14.

**{¶11}** The case then went quiet until Shellpoint moved to substitute itself for Ditech as party plaintiff in April 2022. Shellpoint attached to its motion a copy of a document, dated December 4, 2019, whereby Ditech had assigned its interest in the

mortgage to Shellpoint. The trial court granted the motion.

{¶12} Shellpoint then filed a second motion for summary judgment against Balimunkwe. Shellpoint's principal argument was that Balimunkwe was precluded from relitigating the issue of forgery, because it had already been decided against Balimunkwe in his federal litigation. Shellpoint further argued that Balimunkwe ratified the 2004 note and mortgage by signing a 2006 modification agreement.

{¶13} The magistrate denied both of Shellpoint's arguments as governed by the law of the case following *Balimunkwe IV*, and further suggested that Shellpoint's collateral-estoppel argument was untimely and substantively incorrect. The trial court adopted the magistrate's ruling as to both issues.

### C. Daubert *Hearing, Trial & Aftermath*

{¶14} In February 2023, Balimunkwe filed an expert report from his forensic document examiner ("FDE"), Wendy Carlson. Two months later, Shellpoint moved to exclude Carlson's testimony pursuant to Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). After holding a hearing at which Carlson testified, the magistrate concluded that Carlson's examination procedures were not "conducted in a way that will yield an accurate result." He found that Carlson was not qualified to testify as an expert under Evid.R. 702 and granted Shellpoint's motion to exclude her testimony and report.

{¶15} The case proceeded to trial before the magistrate the next day. The trial involved numerous items of documentary evidence and the testimony of two witnesses: Carli Jo Wilcox, a foreclosure litigation manager for Shellpoint, and Balimunkwe.

{¶16} The magistrate ultimately issued a written decision in favor of Shellpoint. He concluded that, "on the evidence adduced[,] . . . there is due to

6

Shellpoint on the modified promissory note . . . , as set forth in Count One of Plaintiff's Complaint, the principal sum of $53,966.13, plus interest on the outstanding principal balance at the rate of 7.8750 percent per annum from April 1, 2012, plus late charges, plus advances made for the payment of taxes and/or insurance premiums, costs incurred for the protection of the Property under" R.C. 5301.233.

{¶17} Balimunkwe filed four objections to the magistrate's decision, to which Shellpoint responded. After hearing argument, the trial court overruled Balimunkwe's objections, adopted the magistrate's decision, and entered judgment for Shellpoint.

{¶18} Balimunkwe appealed, and Shellpoint cross-appealed.

## II. BALIMUNKWE'S APPEAL

{¶19} We begin with Balimunkwe's appeal. He raises four assignments of error, contending that the trial court erred by overruling his objections to the magistrate's (A) "ruling to exclude the testimony of his handwriting expert witness at trial," (B) "finding that his signatures were not forged," (C) "finding that Ditech had standing when it filed the complaint," and (D) "finding that the 2004 note was modified."

{¶20} In considering these assignments of error, we review not the magistrate's findings themselves, but the trial court's decision to adopt them. Under Civ.R. 53, a trial court may adopt a magistrate's decision if it (1) discovers no "error of law or other defect evident on the face of the magistrate's decision," and (2) determines that any objections lodged should be overruled, after an independent review of the matters objected to. Civ.R. 53(D)(4)(c) and (d). The trial court may engage in further independent review of the magistrate's decision and the underlying record, but it need not do so. *See* Civ.R. 53(D)(4)(b).

{¶21} In light of these requirements, we consider a trial court's decision

7

adopting or rejecting a magistrate's decision under a three-tiered standard of review.

{¶22} *First*, where a party on appeal (1) challenges a trial court's decision adopting a magistrate's finding of fact, conclusion of law, or decision, but (2) never raised that objection before the trial court, we review the trial court's decision only for plain error. Civ.R. 53(D)(3)(b)(iv).

{¶23} *Second*, in all other instances, we review a trial court's adoption or rejection of a magistrate's finding, conclusion, or decision for an abuse of discretion. *See In re Estate of Knowlton*, 2006-Ohio-4905, ¶ 43 (1st Dist.). However, because "courts lack the discretion to make errors of law," *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 39, we consider questions of law effectively de novo. *See Stephan Business Ents. v. Lamar Outdoor Advertising Co.*, 2008-Ohio-954, ¶ 13 (1st Dist.) (holding that "[r]eferral to a magistrate should not circumvent an appellate court's de-novo review" of legal questions). Likewise, a trial court has no "discretion" to find facts counter to the evidence; it must always rule according to the relevant burden of proof. Thus, we will conclude that a trial court exceeded the limits of its discretion if it adopted factual findings against the manifest weight of the evidence, just as we would if the trial court had made such a finding in the first instance. *See Washington v. Am. Gen. Life Ins. Co.*, 2022-Ohio-339, ¶ 13 (1st Dist.), citing *Qiming He v. Half Price Heating & Air*, 2021-Ohio-1599, ¶ 6 (1st Dist.).

{¶24} In other words, a trial court enjoys the same broad discretion when considering objected-to matters in a magistrate's decision as it would in managing proceedings in any other context. But a trial court always exceeds the bounds of that discretion by adopting, over objection, a magistrate's erroneous legal conclusions or factual findings contrary to the manifest weight of the evidence.

{¶25} *Third*, factual and legal determinations a trial court renders after

rejecting the magistrate's determinations are subject to ordinary appellate review.

### A. Expert Testimony

{¶26} In his first assignment of error, Balimunkwe contends that the trial court erred by failing to overrule the magistrate's order excluding the testimony and report of his FDE expert witness, Wendy Carlson. Balimunkwe asserts the magistrate, by holding the hearing and granting the motion to exclude, (1) violated the trial court's local rules, (2) contradicted the law of the case established in *Balimunkwe IV*, and (3) abused its evidentiary-gatekeeping discretion under Evid.R. 702 and *Daubert*.

{¶27} Because Balimunkwe raised neither of the first two arguments in his objections before the trial court, we review them only for plain error. *See* Civ.R. 53(D)(3)(b)(iv). However, Balimunkwe did object on the third basis, so we review it under the same abuse-of-discretion standard we would apply to any other Evid.R. 702 determination. *See Terry v. Caputo*, 2007-Ohio-5023, ¶ 16, citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

{¶28} *First*, Balimunkwe contends that Shellpoint failed to include "a written request for oral argument" in its *Daubert* motion, and that the trial court therefore erred in holding the hearing under Hamilton C.P., Gen.Div., Loc.R. 14(C)(1). This argument is without merit. Even assuming, arguendo, that holding a pretrial *Daubert* hearing without request was plainly erroneous, doing so was just as plainly harmless in this case. Before Carlson could testify as an expert, the magistrate had to qualify her as such under Evid.R. 702. After reading her report and hearing her testimony at a hearing one day before trial, the magistrate concluded she was not qualified. Balimunkwe does not explain how she would have been any more qualified to testify had the magistrate waited to make his Evid.R. 702 assessment on the day of trial. Balimunkwe therefore has not shown that the alleged error affected his substantial

9

rights. *See* Civ.R. 61.

**{¶29}** *Second*, Balimunkwe argues that the magistrate's refusal to qualify Carlson as an expert undermined our ruling in *Balimunkwe IV* and therefore violated the law of the case. But our decision in *Balimunkwe IV* held only that Carlson's "affidavit and expert report . . . created a genuine issue of material fact as to whether Balimunkwe entered into" the 2004 note and mortgage and so precluded summary judgment. *Balimunkwe IV*, 2019-Ohio-3806, at ¶ 10 (1st Dist.). We did not discuss Carlson's qualifications under Evid.R. 702, and we certainly did not render a final determination on that question. The magistrate and trial court were therefore free— indeed, obligated—to address the issue.

**{¶30}** *Third*, Balimunkwe argues that the magistrate and trial court misapplied Evid.R. 702.

**{¶31}** A witness must be qualified as an expert to offer their expert opinion. *See* Evid.R. 701 and 702. A witness is qualified to testify as an expert if the proponent can show (A) that her "testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons"; (B) that she has "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony"; and (C) that her testimony "is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Evid.R. 702.

**{¶32}** This last requirement under Evid.R. 702(C) requires "'not only an examination of the trustworthiness of the tested principles on which the expert opinion rests, but also an analysis of the reliability of an expert's *application* of the tested principals [sic] to the particular set of facts at issue.'" (Bracketed text and

emphasis in original.) *Terry*, 2007-Ohio-5023, at ¶ 26, quoting *Cavallo v. Star Ent.*, 892 F.Supp. 756, 762-763 (E.D.Va. 1995). Testimony concerning "the results of a procedure, test, or experiment" is reliable if (1) the underlying theory is "objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles," (2) the "design of the procedure, test, or experiment reliably implements the theory," and (3) the "particular procedure, test, or experiment was conducted in a way that will yield an accurate result." Evid.R. 702(C).

**{¶33}** It is under this reliability prong that the magistrate and trial court excluded Carlson's expert testimony.

**{¶34}** At the *Daubert* hearing, Carlson testified that she had received digital copies of seven signatures "known" to be from Balimunkwe, as well as several "questioned" signatures taken from the disputed documents, including the 2004 note and mortgage and the 2006 modification agreement. She printed copies of each signature, stapled the printed signatures together on a single page, and then photocopied this stapled compilation to enlarge it.

**{¶35}** Carlson testified she then assessed authorship of the questioned signatures using the "ACE" methodology, an acronym of the methodology's three steps: analyze, compare, and evaluate. Applying that methodology, Carlson began by examining the seven "known" samples to understand how Balimunkwe generally formed his signature. She then compared the "personal patterns," "idiosyncrasies," and "habits" observed in these "known" samples to the "questioned" signatures Balimunkwe had sent her. In making her comparison, Carlson employed the photocopier's magnification and, at times, a jeweler's loop and compass.

**{¶36}** Carlson testified about various aspects of the signatures she deemed relevant to her comparison, including the relative height of certain letters, the

formation of the letters "k" and "m," the formation and connections of the letter "b," the slant of the signature, and the angle of the final stroke's slope. Ultimately, Carlson testified that, in her opinion, the signatures on several documents, including the 2004 note and mortgage, "were highly probabl[y] signed by a person other than the person that signed the known signatures," i.e., Balimunkwe. Carlson further testified that she "eliminated the author of the known Kalemba Balimunkwe signatures . . . as the author of the questioned Kalemba Balimunkwe signatures" on several other questioned documents, including the mortgage amendment signed ten days after the 2004 mortgage.

{¶37} Carlson testified that her conclusions came from "objective" characteristics she observed, but were ultimately based upon her personal judgments about degree of similarity and not empirical data about the frequency with which certain habits occur in the general population. She also testified that she did not apply the "ACE-V" methodology that "some document examiners use," which requires the examiner to employ verification procedures.

{¶38} During the hearing, Shellpoint's attorneys, Carlson, and the trial court all recognized that two of the seven "known" signatures used in Carlson's report were, in fact, duplicates from the same page of the same document (specifically, the original 1999 mortgage). Carlson did not note this fact in her report or in her testimony prior to that point. When the magistrate asked her whether she had noticed the duplicates while she was preparing her report, Carlson responded, "I'm sure I did. I just don't have that information in my folder."

{¶39} Also discussed at the hearing and in Shellpoint's *Daubert* motion was the fact that Carlson's testimony had been excluded as "fundamentally unreliable and critically flawed in so many respects" by a federal court in *Almeciga v. Ctr. for*

*Investigative Reporting, Inc.*, 185 F.Supp.3d 401, 426 (S.D.N.Y. 2016).

**{¶40}** On these facts the magistrate held that Carlson's testimony was not "conducted in a way that will yield an accurate result," and the trial court adopted his decision to exclude her testimony under Evid.R. 702. We cannot say that either abused their discretion in doing so.

**{¶41}** In making his ruling, the magistrate noted his concerns regarding Carlson's failure to note the two duplicate signatures. This was a reasonable consideration. As Carlson testified, her first step was to "analyze" the known signatures to find commonalities and points of variance. There were seven such "known" samples in this case; two were duplicates. The failure to note this fact in her report or in her descriptions of her process prior to prompting suggests one of two possibilities: either Carlson *did not* notice the duplicates, or she *did* notice but chose not to bring them up. The former possibility calls into question her application of a methodology that depends entirely upon the FDE's ability to notice and indicate similarities and differences. The latter possibility suggests she was unconcerned about the duplicate signature artificially inflating her "known" sample size, calling into question what else she may not have mentioned.

**{¶42}** The magistrate also expressed concerns about the way in which Carlson magnified the signatures. This concern, too, was neither arbitrary nor unreasonable. The standards applicable to FDEs, as included in Carlson's report, allow for magnification of writings "sufficient to allow fine detail to be distinguished." But the images Carlson examined went through three transmissions, each of which risked losses in quality and fine detail. Carlson testified that Balimunkwe had provided her with scans of the signed pages—not the originals, which the standards indicate are preferred. Then Carlson printed those scanned images out and stapled them together,

allowing for loss in the printing process. Finally, she photocopied the printouts of Balimunkwe's scans, producing the grainy, black-and-white signatures in her report. In light of these facts, it was not unreasonable for the magistrate to conclude that Carlson's method of magnification did not allow her to examine fine details, and may instead have made such details *harder* to notice.

{¶43} Thus, even assuming the validity of the ACE method for comparing signatures and identifying forgeries as a general matter, the magistrate did not act arbitrarily or unreasonably in concluding that Carlson's report and testimony did not satisfy the requirements of Evid.R. 702(C). Given the small sample size, lack of verification procedures, and reliance on personal judgment rather than statistical data, the magistrate could legitimately conclude that the issues discussed above called the reliability of Carlson's analysis into question.

{¶44} We therefore hold that the magistrate did not abuse his discretion in concluding that Carlson's opinion did not reflect a "reliable application of the principles and methods" of forensic document examination and that her "particular procedure" was not "conducted in a way that will yield an accurate result." Evid.R. 702(C) and (C)(3). Nor did the trial court abuse its discretion in accepting the magistrate's determination on this score.

{¶45} Balimunkwe's first assignment of error is overruled.

### B. Evidence of Forgery

{¶46} In his second assignment of error, Balimunkwe argues that the magistrate's finding that his signatures on the 2004 note and mortgage were not forged was against the manifest weight of the evidence. Balimunkwe objected to this finding before the trial court.

{¶47} A challenge to the weight of the evidence concerns a party's burden of

14

persuasion at trial. *See State v. Messenger*, 2022-Ohio-4562, ¶ 26; *In re S/F Children*, 2025-Ohio-822, ¶ 38 (1st Dist.). We will only hold that a finding was against the manifest weight of the evidence if, after considering the record evidence, the reasonable inferences, and the witnesses' credibility (to the extent discernible from the cold record), it is clear the factfinder lost its way in resolving evidentiary conflicts and created a manifest miscarriage of justice. *Washington*, 2022-Ohio-339, at ¶ 13 (1st Dist.), citing *Qiming He*, 2021-Ohio-1599, at ¶ 7 (1st Dist.).

**{¶48}** As an affirmative defense, Balimunkwe bore the burden of persuasion on his claim of forgery.[2] The magistrate concluded that Balimunkwe did not meet that burden, and the trial court adopted that finding. Upon review, we conclude that finding was not against the manifest weight of the evidence.

**{¶49}** Apart from his own testimony, Balimunkwe offered no trial evidence to show the signatures on the 2004 note and mortgage were forged. Shellpoint, on the other hand, introduced compelling circumstantial evidence suggesting they were *not*. For example, Shellpoint introduced a divorce decree from September 2003, which awarded Balimunkwe ownership of the house at 931 Chateau Avenue. However, because the house was financed by a mortgage and note signed by both Balimunkwe *and* his ex-wife, the court ordered Balimunkwe to use his "best efforts" to refinance the home under his name alone. Five months later, Balimunkwe's signature appeared

---

[2] With respect to the 2004 mortgage, at least, Balimunkwe's burden required "clear and convincing evidence of . . . forgery." *See* R.C. 5301.07(B)(2); *see also Waddell v. Frasure*, 2006-Ohio-6093, ¶ 14 (4th Dist.), citing *Williamson v. Carskadden*, 36 Ohio St. 664, 666 (1881) ("[I]n the absence of clear and convincing proof of fraud or forgery, the certificate of a notary stating that the [document] was freely signed and acknowledged . . . is conclusive evidence of the facts stated in the notary's certification."). It is less clear what standard of proof applied with respect to the unnotarized 2004 note. The magistrate and trial court make no mention of the heightened standard of proof and appear to have found that Balimunkwe failed to satisfy even the preponderance-of-the-evidence standard. We review the findings on that assumption and find, even under the lower standard, that the trial court's finding was not against the manifest weight of the evidence.

on the 2004 mortgage and note without his ex-wife's name, in apparent compliance with the court's order.

{¶50} Shellpoint further introduced evidence that the records associated with the 2004 mortgage and note contained highly personal documents pertaining to Balimunkwe, apparently obtained in or around February 2004—the sort of documents one submits in a refinancing application. For example, Shellpoint introduced a copy of Balimunkwe's child-support-payment history for a period ending on January 31, 2004, which included markings indicating it was faxed just days before the signing of the 2004 note and mortgage. Carli Jo Wilcox, Shellpoint's foreclosure litigation manager, testified that this record was included with the loan-origination materials that Shellpoint received from the prior loan servicer when Shellpoint began servicing the loan under the 2004 note. Also included with the loan-origination materials were a copy of Balimunkwe's homeowner's insurance policy faxed on February 4, 2004; a copy of his 2002 tax return faxed on January 29, 2004; and a photocopy of Balimunkwe's driver's license attached to an "Identification Verification Acknowledgement," signed by a closing agent on February 10, 2004.

{¶51} Further, while the 2004 note was not notarized, the 2004 mortgage was. Shellpoint introduced the mortgage, which included a notary's seal averring, "This instrument was acknowledged before me this 10th of Feb. 2004, by KALEMBA B BALIMUNKWE, unmarried."

{¶52} Despite this strong circumstantial evidence suggesting the signatures' validity, Balimunkwe argues that the trial court erred by refusing to compare the signatures on his original, undisputed 1999 mortgage document with those on the disputed 2004 note and mortgage.

{¶53} Balimunkwe is right that a trier of fact is entitled to compare signatures

and make findings based on such comparisons. *See* Evid.R. 901(B)(3) (document may be authenticated by comparison with other authenticated documents by trier of fact); *Medina Drywall Supply, Inc. v. Procom Stucco Sys.*, 2006-Ohio-5062, ¶ 7 (9th Dist.), quoting *State v. Norwood*, 1991 Ohio App. LEXIS 304, *20 (6th Dist. Jan. 25 1991) ("'A trier of fact can make a comparison of a known writing by a person with other writings without the assistance of an expert or a lay witness to determine whether all the writings were executed by the same person.'"). But in this case, we have no indication that the trial court did not make such a comparison. The signatures were all in the record, and the magistrate and trial court both knew that Balimunkwe's arguments largely turned on the alleged inconsistencies between them. Neither decision affirmatively stated that the magistrate or trial court did not consider the appearance of the signatures. Rather, the magistrate and trial court may simply have found that the signatures did not look particularly different—or that they did not look different *enough* to undermine the circumstantial evidence of authorship.

{¶54} Having examined the signatures ourselves, we cannot say that either conclusion would have run counter to the manifest weight of the evidence. While there is a degree of variation among the signatures, there are also many, many consistencies. A reasonable factfinder could easily conclude that the various iterations of Balimunkwe's signature fell within the plausible range of variation over a five-year span.

{¶55} Given the significant circumstantial evidence presented by Shellpoint, we hold that the magistrate did not lose his way in concluding that Balimunkwe failed to prove the signatures were forgeries. His finding to that effect was therefore not against the manifest weight of the evidence, and the trial court did not abuse its discretion in adopting it. Balimunkwe's second assignment of error is thus overruled.

17

## *C. Standing*

**{¶56}** In his third assignment of error, Balimunkwe contends that Ditech, Shellpoint's predecessor in interest and the original plaintiff in the action below, lacked standing at the time it filed the complaint.

**{¶57}** In order to commence a lawsuit, a plaintiff must have standing to sue. "Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends on whether the party has alleged a personal stake in the outcome of the controversy." (Cleaned up.) *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 2012-Ohio-5017, ¶ 21. Standing must be established as of the time the party invokes the court's jurisdiction, and a "lack of standing at the commencement of a foreclosure action requires dismissal of the complaint." *Id.* at ¶ 40. "In a foreclosure action, a party has standing when it has an interest in the note or mortgage." *Bank of Am., N.A. v. Kenney*, 2015-Ohio-2485, ¶ 7 (1st Dist.).

**{¶58}** In this case, the note was indorsed in blank, so that whoever held it would have been entitled to enforce the mortgage securing the note. *See U.S. Bank, N.A. v. Tye*, 2024-Ohio-2922, ¶ 17 (1st Dist.); *Kernohan v. Manss*, 53 Ohio St. 118, 133 (1895). Balimunkwe contends that Ditech and Shellpoint failed to prove that Ditech held the note at the time it commenced its suit.

**{¶59}** We need not address who held the note, however, because Ditech clearly had standing as mortgage assignee at the time it filed suit. We have said that "a party has standing when it has an interest in the note *or mortgage.*" (Emphasis added.) *Kenney* at ¶ 7; *accord Secy. of Veterans Affairs v. Shaffer*, 2015-Ohio-2237, ¶ 41 (5th Dist.); *CitiMortgage, Inc. v. Patterson*, 2012-Ohio-5894, ¶ 21 (8th Dist.) ("[A] party may establish its interest in the suit, and therefore have standing to invoke the jurisdiction of the court when, at the time it files its complaint of foreclosure, it either

(1) has had a mortgage assigned *or* (2) is the holder of the note." (Emphasis in original.)). Based on this principle, a plaintiff has standing to enforce an assigned mortgage, regardless of whether that plaintiff proves it also held the note. *See*, *e.g.*, *Fannie Mae v. Walton*, 2015-Ohio-2855, ¶ 22 (8th Dist.) (holding that assignment of mortgage provided independent basis for standing); *see also Fannie Mae v. DeMartin*, 2019-Ohio-2136, ¶ 18 (10th Dist.) ("Accordingly, the record indicates the mortgage was assigned to appellee before it filed its complaint, and, therefore, it had standing to foreclose.").

{¶60} In this case, the evidence showed that RCS assigned its interest in the mortgage to Ditech in July 2016. Ditech then filed its complaint in February 2017. Then, in December 2019, Ditech assigned its interest in the mortgage to Shellpoint. Thus, the evidence plainly showed that, at the time Ditech filed the complaint, it had "an interest in the . . . mortgage" as assignee and therefore had standing to enforce that mortgage in foreclosure. *See Kenney*, 2015-Ohio-2485, at ¶ 14 (1st Dist.). Balimunkwe's third assignment of error is overruled.

### D. *Modification of Agreement & Interest Rate*

{¶61} Balimunkwe's fourth and final assignment of error concerns the applicable interest rate. The trial court's judgment for Shellpoint included an award of the $53,966.13 balance, plus late charges and interest at a rate of 7.875 percent per annum from April 12, 2012. This interest rate corresponds not to the rate listed in the 2004 note, which started at 7.125 percent, but to the rate in the 2006 modification agreement.

{¶62} Balimunkwe contends that the trial court erred in adopting the magistrate's finding that Shellpoint was entitled to collect on the note as modified by the 2006 modification agreement. His argument has three parts. First, Balimunkwe

19

argues that Shellpoint (and Ditech) failed to include the modification in their complaint, so that the modification fell outside the issues raised in the pleadings. Second, Balimunkwe argues that the 2006 modification agreement was not properly authenticated and should not have been admitted into evidence. Third, Balimunkwe argues that, even assuming the issue of modification was in the case, and even assuming the 2006 modification agreement was properly authenticated, Shellpoint "failed to sufficiently demonstrate a sufficient nexus between all the parties in the chain of title and lacks standing to enforce the Modification."

### 1. Failure to Plead Modification

**{¶63}** Balimunkwe argues that Ditech/Shellpoint's complaint failed to adequately put the modification agreement in issue. But this misframes the question before us. The complaint alleged that Ditech/Shellpoint was owed "the sum of $53,966.13, with interest at the rate of 7.8750% per year from April 1, 2012." Balimunkwe denied this allegation in his answer. Shellpoint was obligated to prove the alleged interest rate *somehow*. It did so by introducing the 2006 modification agreement into evidence. The question is simply whether the failure to attach that agreement to the complaint precluded its use as evidence at trial. It did not.

**{¶64}** The absence of the 2006 modification agreement did not render Ditech/Shellpoint's pleadings legally insufficient. Civ.R. 10(D)(1) requires that, "[w]hen any claim or defense is founded on an account or other written instrument, a copy of the account or written instrument must be attached to the pleading. If the account or written instrument is not attached, the reason for the omission must be stated in the pleading." Ditech/Shellpoint's operative complaint did not include a copy of the 2006 modification agreement, any express reference to it, or any explanation for its absence. However, a party's failure to attach a written instrument under Civ.R.

10(D)(1) is not fatal and does not render a complaint insufficient. *See Fletcher v. Univ. Hosps. of Cleveland*, 2008-Ohio-5379, ¶ 11; *Wells Fargo Bank N.A. v. Horn*, 2015-Ohio-1484, ¶ 16. Had Balimunkwe wished for more specifics as to the basis for the 7.875 percent rate at the pleading stage, his remedy was to move for a more definite statement under Civ.R. 12(E). *See Fletcher* at ¶ 11. He did not do so.

**{¶65}** And, to the extent Balimunkwe suggests that the 2006 modification agreement's existence or validity were issues outside of the pleadings, Balimunkwe consented to trying them. Under Civ.R. 15(B), "issues not raised by the pleadings" may be "tried by express or implied consent of the parties," and, if so tried, "shall be treated in all respects as if they had been raised in the pleadings." Under such circumstances, parties may amend the pleadings "to cause them to conform to the evidence and to raise these issues," but a "[f]ailure to amend . . . does not affect the result of the trial of these issues." *Id.* If Balimunkwe believed that evidence regarding the 2006 modification agreement concerned issues not within the pleadings, then Balimunkwe had to object to its admission "at the trial." Civ.R. 15(B). He raised no such objection before the magistrate. Instead he willingly litigated the substantive validity of the 2006 modification agreement. He therefore impliedly consented to try any issues concerning the applicability and content of the 2006 modification agreement.

### 2. *Authentication of 2006 Modification Agreement*

**{¶66}** Next, Balimunkwe contends that the 2006 modification agreement was never properly authenticated. But this claim, too, lacks merit, because the agreement was self-authenticating.

**{¶67}** "Documents accompanied by a certificate of acknowledgment executed in the manner provided by law by a notary public or other officer authorized by law to take acknowledgments" do not require "[e]xtrinsic evidence of authenticity as a

condition precedent to admissibility." Evid.R. 902(B)(8). Neither do "[c]ommercial paper, signatures thereon, and documents relating thereto to the extent provided by general commercial law." Evid.R. 902(B)(9). Encompassed within this latter category are promissory notes "and loan modification agreement[s]." *See U.S. Bank Natl. Assn. v. George*, 2020-Ohio-6758, ¶ 14 (10th Dist.).

**{¶68}** The 2006 modification agreement introduced at trial fit both these molds. The record clearly demonstrates that the 2006 modification agreement introduced at trial contained Balimunkwe's original, blue-ink signature. The magistrate noted on the record that "Mr. Bal[i]munkwe and Ms. Wilcox both testified from original documents, but those are not being placed into the record, what is being placed into the record are photo copies of the original documents." The 2006 modification agreement was notarized and purported to modify the terms of a promissory note. It was therefore self-authenticating, both as an original version of a "document relating to" commercial paper, and because it was "accompanied by a certificate of acknowledgment executed . . . by a notary public." Evid.R. 902(B)(8) and (9).

### 3. Chain of Title & Parties to the Modification

**{¶69}** Balimunkwe's final contention is that Shellpoint's evidence failed to show that NCHLS, identified as the "Note Holder" in the 2006 modification agreement, in fact held the note at the time the modification agreement was signed. Balimunkwe contends—rightly—that NCHLS would have had no authority to modify the terms of a promissory note it did not hold.

**{¶70}** The 2006 modification agreement identifies NCHLS as the "Note Holder," and states that "Note Holder is the holder of a Mortgage, Security Deed or Deed of Trust . . . from the borrower encumbering property known as 931 CHATEAU

AVE CINCINNATI, OH 45204 . . . dated February 10, 2004, . . . securing an obligation evidenced by a promissory note . . . executed by Borrower on February 10, 2004, in the original principal amount of $63,750.00."

**{¶71}** NCHLS did not execute the 2004 note and mortgage; First Franklin, a subsidiary of NCBI did. And the next record of assignment admitted at trial shows that in August 2010, First Franklin—*not* NCHLS—assigned the mortgage to RCS.

**{¶72}** But because the note was indorsed in blank, whoever held the note was permitted to enforce it, *Tye*, 2024-Ohio-2922, at ¶ 17 (1st Dist.)—and, presumably, to enter into an agreement modifying its terms—regardless of to whom the mortgage was assigned. While there is evidence that First Franklin held the note in 2008, that does not preclude the possibility that NCHLS held it in 2006, when the modification agreement was signed.

**{¶73}** There is no evidence in the record as to the relationship, if any, between NCHLS and NCBI. Ms. Wilcox testified, while discussing the 2006 modification agreement, that First Franklin is "a subsidiary of National City," but this could mean *either* NCHLS *or* NCBI, as both names begin with "National City."

**{¶74}** There is at least *some* circumstantial evidence that NCHLS held the note at the time it entered into the 2006 modification agreement with Balimunkwe. Ms. Wilcox testified that the modification agreement bearing Balimunkwe's original, blue-ink signature was included in the collateral file received by Shellpoint. It is hard to imagine how that document would get into the collateral file with the original note and mortgage deed, unless NCHLS either held the note in 2006 and conveyed it back to First Franklin/NCBI before 2008, or was an alter ego of First Franklin/NCBI at that time. And this, in turn, supports an inference that NCHLS held rights in the 2004 note when the 2006 modification agreement was signed.

23

**{¶75}** This evidence is slight, but Shellpoint's burden was a mere preponderance of the evidence. The magistrate and trial court thus found only that the evidence made it more likely than not that NCHLS was either an alter ego/subsidiary of First Franklin/NCBI, or was the holder of the note at the time the 2006 modification agreement was signed. We cannot say the magistrate or trial court lost its way or created a manifest miscarriage of justice in finding that this evidence tipped the scales slightly toward Shellpoint. Its finding, therefore, was not against the manifest weight of the evidence.

**{¶76}** We therefore hold that the trial court did not err in considering the 2006 modification agreement and using the 7.875 percent interest rate to calculate the amount Balimunkwe owed. Balimunkwe's fourth assignment of error is overruled.

### III. Shellpoint's Cross-Appeal

**{¶77}** Shellpoint cross-appealed the trial court's judgment. It raises a single assignment of error, arguing that the "trial court should have granted Shellpoint's second motion for summary judgment" on grounds of collateral estoppel.

**{¶78}** We have already overruled Balimunkwe's four assignments of error and are thus compelled to affirm the trial court's judgment. Even if we sustained Shellpoint's assignment of error, Shellpoint would be entitled to no greater relief than this. Its assignment of error is therefore moot and we do not address it. *See State v. Gideon*, 2020-Ohio-6961, ¶ 26 ("[A]n assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court."); App.R. 12(A)(1)(c).

### IV. Conclusion

**{¶79}** Having overruled all four of Balimunkwe's assignments of error and having found Shellpoint's sole assignment of error moot, we affirm the judgment of

the trial court.

Judgment affirmed.

**BOCK** and **MOORE, JJ.,** concur.